DERALD PRATHER ET AL., APPELLEES, V. DON EISENMANN ET AL., APPELLANTS.

261 N. W. 2d 766

Filed February 1, 1978.   No. 41203.

Thomas H. DeLay of Mueting, DeLay & Spittler, for appellants.

George H. Moyer, Jr., of Moyer, Moyer & Egley, for appellees.

Deutsch, Jewell, Otte, Gatz, Collins & Domina, for amicus curiae.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

SPENCER, J.

This is an action brought by domestic well owners to enjoin the pumping of ground water from an irrigation well owned by defendants, and for damages. The District Court found defendants' withdrawal caused a loss of artesian pressure in plaintiffs' wells, interfering with their domestic appropriation.

The court found the water was sufficient for all users if plaintiffs lowered their pumps to below the aquifer and defendants did not lower their pump. It permanently enjoined defendants from lowering their pump and from pumping for the period of time reasonably required by plaintiffs to lower their pumps. The court awarded plaintiffs the necessary costs of providing an assured alternative method of water supply, or a total recovery of $5,346.58. We affirm.

Plaintiffs Prathers are the owners of a 9-acre tract upon which they maintain their residence. The residence is supplied with water by an artesian well located on the premises. The artesian pressure was normally sufficient to force water in the well to a level 5 to 6 feet above the ground. The well was 121 feet 10 inches deep and 2 inches in diameter.

Two other landowners, Furleys and Zessins, assigned their claims to Prathers. Unless designated by name hereafter, they are included in the title "plaintiffs." The Furleys are the owners of a 2-acre tract. The residence on the premises is supplied

with water from an artesian well 111 feet deep and 2 inches in diameter. The artesian pressure was sufficient to raise the water above the ground.

The Zessins are the owners of a tract of land in the same area which is occupied by their daughter. The residence upon the premises is supplied with water by a 160-foot well with 4-inch casing and a submersible pump. The water in the Zessin well did not rise above the surface of the ground.

Defendants Eisenmanns purchased a 90-acre tract of land in the area in March of 1976. On July 9, 1976, they completed an irrigation well on the premises. The well was 179 feet deep and had a capacity of 1,250 gallons per minute on a 2-hour test.

On July 9, 1976, Eisenmanns commenced pumping from the well at an estimated rate of 650 gallons per minute. Prathers and Furleys lost the use of their wells on July 10, 1976. Zessins lost the use of their well between the evening of July 12 and the morning of July 13 when the water level dropped below the level of the submersible pump. Because of the loss of water, the Zessins' pump overheated and welded itself to the casing. Zessins were unable to dislodge the pump and were forced to drill a new well to a depth of 164 feet.

Following a stipulation by the parties, a temporary injunction was issued on July 20, 1976, to permit the University of Nebraska Conservation and Survey Division to conduct certain tests on the wells. The tests consisted of pumping the irrigation well at a rate of 375 gallons per minute for 3 days, then measuring the draw down of the Eisenmanns' well and a number of other observation wells which included the three domestic wells. At the end of the pumping period the measured draw down on the Prathers' well was 61.91 feet; the Furleys' well, 65.45 feet; and the Zessins' well, 65.6 feet. The draw down of the Eisenmanns' well was 97.92 feet. All the wells recovered to the prepumping level within 11

days after cessation of pumping from the irrigation well.

The two hydrologists who conducted the tests made certain findings: (1) The irrigation well and the domestic wells were drawing from the same aquifer. (2) The aquifer could be defined with reasonable scientific certainty. (3) The pumping by Eisenmanns depressed the artesian head of the domestic wells. (4) The cone of influence caused by Eisenmanns' pumping intercepted or affected the plaintiffs' wells. (5) The common aquifer from which the domestic and irrigation wells draw water is sufficient to supply both domestic and irrigation needs. (6) For plaintiffs to obtain water from their wells during periods when Eisenmanns were pumping, they would have to pump water from the top of the shale.

Section 46-635, R. R. S. 1943, defines "ground water" as: "* * * that water which occurs or moves, seeps, filters, or percolates through the ground under the surface of the land." The existence of ground water in any particular area is dependent not only on the source of the water but also on the geologic formation of the earth. The earth materials with sufficient porosity to contain significant amounts of ground water and sufficient permeability to allow its withdrawal in significant quantities are called "aquifers." The upper surface of the water-saturated material is called "the water table."

Aquifers are almost always underlain by an impervious layer which prevents the water from percolating and seeping downward to such a level that it would be beyond economical reach. Two of the domestic wells involved were dependent upon artesian pressure. This results when ground water is not only underlain by impervious material but is confined between or underneath impervious layers as well. A well penetrating through one of the sur-

rounding impervious layers provides an escape valve through which water will flow without external force so long as sufficient artesian pressure exists.

Before restating the current Nebraska law, it is well to note the various common law views concerning rights to ground water. The nonstatutory theories are classified as: (1) The common law, or English rule; (2) the reasonable use, or American rule; and (3) the correlative rights doctrine, or California rule.

Under the English or common law rule, a landowner had absolute ownership of the waters under his land. He could, therefore, without liability, withdraw any quantity of water for any purpose even though the result was to drain all water from beneath surrounding lands.

The American rule of reasonable use also recognized a proprietary interest of an overlying owner in the waters under his lands. " ' "The American, as distinguished from the English rule, is that, while the owner of the land is entitled to appropriate subterranean or other waters accumulating on his land, which thereby becomes a part of the realty, he cannot extract and appropriate them in excess of a reasonable and beneficial use upon the land he owns, unconnected with the beneficial use of the land, especially if the exercise of such use in excess of the reasonable and beneficial use is injurious to others, who have substantial rights to the water." ' " Metropolitan Utilities Dist. v. Merritt Beach Co., 179 Neb. 783, 140 N. W. 2d 626 (1966). There is no preference as to use under the American rule.

The California or correlative rights rule essentially provides the rights of all landowners over a common aquifer are coequal or corelative and one cannot extract more than his share of the water even for use on his own land where others' rights are injured thereby.

Nebraska has had few decisions dealing with un-

derground water problems. In Olson v. City of Wahoo, 124 Neb. 802, 248 N. W. 304, our court, in 1933, enunciated a modified reasonable use rule. It said: "The American rule is that the owner of land is entitled to appropriate subterranean waters found under his land, but he cannot extract and appropriate them in excess of a reasonable and beneficial use upon the land which he owns, especially if such use is injurious to others who have substantial rights to the waters, *and if the natural underground supply is insufficient for all owners, each is entitled to a reasonable proportion of the whole,* and while a lesser number of states have adopted this rule, it is, in our opinion, supported by the better reasoning." (Italics supplied.) The portion emphasized was not a part of the American rule as enunciated in a majority of the states. Nebraska, in Olson, adopted the rule of reasonable use with the addition of the California doctrine of apportionment in time of shortage.

In the subsequent case of Luchsinger v. Loup River P. P. Dist., 140 Neb. 179, 299 N. W. 549 (1941), the court's attention was directed to the fact that the Olson enunciation was dicta. The contention was made it was not binding on the defendants in that controversy. The court answered the suggestion of dicta as follows: "Whatever may be thought of its applicability to the case in which the rule was adopted, it answers for itself as a sound proposition of law essential to the protection of property rights of private individuals and is consistent with the Constitution and with morality and justice."

In Metropolitan Utilities Dist. v. Merritt Beach Co., 179 Neb. 783, 140 N. W. 2d 626 (1966), this court said: "The rule in this state as to the rights of riparian owners is that, while the owner of land is entitled to appropriate subterranean or other waters accumulating on his land, which thereby becomes a part of the realty, he cannot extract and appropriate them in excess of a reasonable and beneficial use

upon the land he owns, unconnected with the beneficial use of the land, especially if the exercise of such use in excess of the reasonable and beneficial use is injurious to others who have substantial rights to the water.'' This statement, which was the reasonable use doctrine, led some commentators to question whether the omission of proportionate use was intentional. It was not. Proportional use was not involved in that case. Our law remained as it was enunciated in Olson v. City of Wahoo, 124 Neb. 802, 248 N. W. 304 (1933).

The question the instant case presents is one of first impression in this state. The three domestic wells of the plaintiffs do not contribute significantly to a reduction in the artesian pressure or water level of the underground aquifer. It was not until the defendants subsequently sunk and operated their irrigation well that plaintiffs lost the artesian pressure and the use of their wells.

The evidence indicates defendants had a runoff of approximately 15 to 25 gallons of water per minute above the water utilized on their land. The trial court found this was in excess of a reasonable and beneficial use on their own land. It is not necessary for us to reach this issue. We do not deem it material in view of the decision we reach herein. This case must be analyzed in reference to section 46-613, R. R. S. 1943, the preferential use statute.

Under the reasonable use doctrine, two neighboring landowners, each of whom is using the water on his own property overlying the common supply, can withdraw all the supply he can put to beneficial and reasonable use. What is reasonable is judged solely in relationship to the purpose of such use on the overlying land. It is not judged in relation to the needs of others. Harnsberger, Oeltjen, & Fischer, Groundwater: From Windmills to Comprehensive Public Management, 52 Neb. L. Rev. 179 at p. 205 (1973).

Our preference statute points the way to a solution of the present controversy. It is apparent the trial court used it with an adaptation of the rule proposed in the Tentative Draft No. 17 of section 858A of Restatement, Torts 2d (1971). That rule provides in part: "§ 858A. Non-liability for use of ground water — exceptions. A possessor of land or his grantee who withdraws ground water from the land and uses it for a beneficial purpose is not subject to liability for interference with the use of water by another, unless (a) the withdrawal of water causes unreasonable harm through lowering the water table or reducing artesian pressure, * * *." The District Court found defendants' appropriation of water "caused unreasonable harm to plaintiffs by lowering the water table and reducing artesian pressure."

The comment in Restatement, Torts 2d, suggests the tentative rule is the American rule with its protection broadened. It is not so broad, however, as the Nebraska rule. As the comment notes, it gives more or less unrestricted freedom to the possessor of overlying land to develop and use ground water. It does not attempt to apportion the water among users except to the extent that special conditions permit it to be done on a rational basis. It gives the protection of the American rule to owners of small wells harmed by large withdrawals for use elsewhere, but extends that protection in proper cases to harm done by large withdrawals for operation on overlying lands.

Much of the litigation involving users of ground water has involved the collateral effects of a withdrawal of the water rather than a division of it. There was no problem here with the artesian pressure until defendants withdrew in excess of 350 gallons per minute and lowered the water beyond the reach of the domestic wells.

There is sufficient water in the aquifer for all the parties if defendants' irrigation well remains at its

present level and the domestic wells are lowered to the top of the shale. The trial court found plaintiffs had been damaged to the extent of the expense necessary to lower their wells to the shale.

The term reasonable use, as contemplated in the American rule, relates to the manner in which water is used upon the land of the appropriator. The interests of adjacent landowners are in issue only when the appropriator uses water in excess of the reasonable and beneficial use of it upon his land, and that excess use is injurious to the adjacent landowner.

The term "reasonable use" as defined in the correlative rights doctrine means reasonable share of the whole. Under the correlative rights doctrine, the overlying owners have no proprietary interest in the water, and in times of shortage each overlying owner has an equal and correlative right to make beneficial use of his proportionate share of the water.

Reasonable use, as defined in the proposed Restatement doctrine, means a balancing of the equities between the use made of the water by the subsequent appropriator versus the injury caused by that use to the prior appropriator.

The Nebraska rule, as previously pointed out, is a combination of the American and the correlative rights doctrine. It must be construed, however, in the light of our preference statute, section 46-613, R. R. S. 1943. This statute provides as follows: "Preference in the use of underground water shall be given to those using the water for domestic purposes. They shall have preference over those claiming it for any other purpose. Those using the water for agricultural purposes shall have the preference over those using the same for manufacturing or industrial purposes.

"As used in this section, domestic use of ground water shall mean all uses of ground water required for human needs as it relates to health, fire control,

and sanitation and shall include the use of ground water for domestic livestock as related to normal farm and ranch operations.''

It is our statute which distinguishes the Nebraska rule from other rules. Under the statute, the use of underground water for domestic purposes has first preference. It takes priority over all other uses. As between domestic users, however, there is no preference or priority. Every overlying owner has an equal right to a fair share of the underground water for domestic purposes. If the artesian head in the present situation had been lowered by other domestic users, plaintiffs would be entitled to no relief so long as they still could obtain water by deepening their wells. If the water became insufficient for the use of all domestic users, each domestic user would be entitled to a proportionate share of the water. All domestic users, regardless of priority in time, are entitled to a fair share of the water in the aquifer.

That, however, is not the present problem. We are dealing with plaintiffs who have preferential rights. We are confronted with the situation where the appropriation by the defendants rendered the plaintiffs' well useless during the pumping period and the period of time after the pumping ceased to recharge the area so the water again reached plaintiffs' pumps. In the case of the 3-day test conducted by the hydrologists, this recharge period was 11 days. In the case of the Zessin well, the appropriation by defendants also froze the pump to the pipe and required the drilling of a new well.

Plaintiffs can still obtain sufficient water for domestic purposes by drilling wells to the shale. It would not have been necessary for them to incur the necessary expense to do so except for the action of defendants. Without question, plaintiffs have been damaged by the operation of defendants' well. As the trial court found, defendants' withdrawal of water caused unreasonable harm to plaintiffs by

lowering the water table or reducing the artesian pressure. Plaintiffs had obtained a property right in that use so they should have a remedy for their damage.

The remedy devised by the trial court presents a very equitable solution. It reimburses the plaintiffs only for the expense they were forced to incur because of the action of the defendants. Plaintiffs' wells were very adequate for their own purposes. Their use of water for domestic purposes took precedence over the appropriation for agricultural purposes by the defendants. Plaintiffs had a valuable property right in the extraction of water for domestic purposes. It was solely defendants' action which deprived them of their right. Defendants, by pumping large quantities of water from the same aquifer, destroyed the artesian pressure for two of the wells. For the other well, which was deeper and used a pump, defendants' action lowered the water below the reach of the pump and the resultant heat froze the pump to the pipe. The only way plaintiffs could be assured of water for domestic purposes was to drill wells to the shale. This expense was thrust upon plaintiffs solely as a consequence of defendants' action in destroying plaintiffs' artesian pressure and lowering the water below the reach of their domestic wells. Plaintiffs' right to the extraction of water from their existing wells was appropriated or destroyed by the action of defendants. What should be the extent of plaintiffs' damage? Certainly it should be the cost of restoring or obtaining what plaintiffs had before it was appropriated by defendants' action.

The measure of recovery in all civil cases is compensation for the injury sustained. Abel v. Conover, 170 Neb. 926, 104 N. W. 2d 684 (1960). We hold the defendants are liable for the necessary and reasonable expense to restore what plaintiffs lost by de-

dants' action. This is the result reached by the trial judge, and we affirm the judgment rendered.

The solution devised by the District Court is the correct one. The judgment is affirmed.

AFFIRMED.