SPEAR T RANCH, INC., APPELLANT, V.
MELVIN G. KNAUB ET AL., APPELLEES.

691 N.W.2d 116

Filed January 21, 2005. No. S-03-789.

178

Thomas D. Oliver for appellant.

Harriet M. Hageman and Kara Brighton, of Hageman & Brighton, for appellees George A. Davis and Loretta L. Davis.

John F. Simmons, of Simmons & Olsen Law Firm, P.C., for appellees John Gifford and Roger Gifford.

Michael J. Javoronok, of Michael J. Javoronok Law Firm, for appellees Max Olsen, Olsen Ranches, Inc., Melvin G. Knaub, Melvin G. Knaub Farms, Inc., Knaub, Inc., Melvin G. Knaub Grand Kids L.P., and Special K, Inc.

Daniel M. Placzek, of Leininger, Smith, Johnson, Baack, Placzek, Steele & Allen, for appellee Olsen Ranches, Inc.

John H. Skavdahl, of Skavdahl & Edmund Law Office, for appellee Gifford Circle Diamond Ranch, Inc.

Daniel L. Lindstrom, of Jacobsen, Orr, Nelson, Wright & Lindstrom, P.C., for appellee XL Farms, L.L.C.

Philip M. Kelly, of Douglas, Kelly, Ostdiek, Bartels & Neilan, P.C., for appellees Richard Van Pelt and Margaret Van Pelt.

Paul E. Hofmeister, of Chaloupka, Holyoke, Hofmeister, Snyder & Chaloupka, P.C., L.L.O., for appellees Hoehn Farms, Mark Hoehn, Krista Hoehn, and Allison Hoehn.

James M. Mathis and Leland K. Kovarik, of Kovarik, Ellison, Mathis & Weimer, P.C., for appellees Leeray Edens and Beverly Edens.

Albert M. Engles and Jason R. Yungtum, of Engles, Ketcham, Olson & Keith, P.C., for appellee Donahue & Rutledge, Inc.

Robert M. Brenner, of Robert M. Brenner Law Office, for appellee Darnall Ranch, Inc.

Jon Bruning, Attorney General, David D. Cookson, and Justin D. Lavene for amicus curiae State of Nebraska.

Dana W. Roper, Lincoln City Attorney, and Steven Huggenberger for amicus curiae City of Lincoln.

Steven C. Smith, of Pahlke, Smith, Snyder, Petitt & Eubanks, G.P., for amici curiae Pathfinder Irrigation District et al.

Donald G. Blankenau, of Fennemore & Craig, P.C., for amicus curiae Nebraska Groundwater Management Coalition.

Donald G. Blankenau, of Fennemore & Craig, P.C., for amicus curiae Nebraska Farm Bureau Federation.

Michael C. Klein, of Anderson, Klein, Swan & Brewster, for amicus curiae Central Nebraska Public Power and Irrigation District.

Robert J. McCormick for amicus curiae Reban Corporation.

LeRoy W. Sievers, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., for amicus curiae Nebraska State Irrigation Association.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

This appeal presents the question whether a surface water appropriator has a claim against a ground water user for interference with a surface water users' appropriation.

Spear T Ranch, Inc. (Spear T), a surface water appropriator, appeals a district court order dismissing with prejudice its complaint seeking an injunction and damages for the loss of surface water from Pumpkin Creek. The appellees are ground water irrigators in the Pumpkin Creek basin.

On appeal, Spear T argues that it has stated a claim for conversion, injunction, or trespass. The appellees, however, argue that any common-law claims are abrogated by the Nebraska Ground Water Management and Protection Act (GWMPA), Neb. Rev. Stat. §§ 46-656.01 through 46-656.67 (Reissue 1998 & Cum. Supp. 2002) (now found at Neb. Rev. Stat. §§ 46-701 through 46-753 (Reissue 2004)). In the alternative, they argue that the issues should be determined by the North Platte Natural Resources District under the doctrine of primary jurisdiction.

## I. BACKGROUND

Spear T filed a complaint alleging that it has surface water appropriations on Pumpkin Creek, which runs through Banner and Morrill Counties. The appellees own real property in the Pumpkin Creek basin and have irrigation wells within the boundaries of the basin. The complaint alleged that the ground water irrigation wells are hydrologically connected to Pumpkin Creek. According to Spear T, the appellees' pumping of ground water over the 4 years preceding the complaint drained water from Pumpkin Creek and deprived Spear T of its surface water appropriations; the complaint alleged that the appellees have continued to pump ground water and that Spear T has been unable to irrigate crops and provide water for livestock. Spear T alleged that the appellees converted its surface water rights to their own use without compensating Spear T and that it would be irreparably harmed if the appellees continued to use their ground water irrigation wells. The complaint sought compensation for the value of the surface water appropriations taken by the appellees or, in the alternative, special damages for the value of the water rights and other damages; it also sought an injunction.

The appellees moved under Neb. Ct. R. of Pldg. in Civ. Actions 12(b) (rev. 2003) to dismiss, alleging that (1) the court lacked subject-matter jurisdiction, (2) the complaint failed to state a claim upon which relief could be granted, and (3) the complaint failed to join necessary parties. Without giving its reasoning, the court dismissed the complaint with prejudice on all three grounds. Spear T appealed.

We initially heard oral arguments in March 2004. After arguments, the appellees moved for additional briefing and reargument to address the primary jurisdiction issue. Also after arguments, 2004 Neb. Laws, L.B. 962, was passed, which changed provisions of the GWMPA. We granted the motion and ordered additional briefing and argument on the following issues: (1) primary jurisdiction; (2) primary jurisdiction because of L.B. 962; (3) the effect of L.B. 962, if any, on the appeal; and (4) whether the GWMPA or L.B. 962 has abrogated any common-law remedies that Spear T might have.

## II. ASSIGNMENTS OF ERROR

Spear T assigns that the district court erred when it dismissed its complaint for lack of subject-matter jurisdiction, failure to state a claim, and failure to join necessary parties.

## III. STANDARD OF REVIEW

This action involves a rule 12 motion to dismiss for failure to state a claim and a rule 12 motion to dismiss for failure to join indispensable parties. In 2003, the Nebraska rules of pleading were changed to reflect the federal rules. Thus, we apply the new rules for notice pleading. See Neb. Ct. R. of Pldg. in Civ. Actions 1 (rev. 2004).

A district court's grant of a motion to dismiss is reviewed de novo. *Weeder v. Central Comm. College, ante* p. 114, 691 N.W.2d 508 (2005). Complaints should be liberally construed in the plaintiff's favor and should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief. *Kellogg v. Nebraska Dept. of Corr. Servs., ante* p. 40, 690 N.W.2d 574 (2005).

The federal courts have made it clear that a complaint should not be dismissed merely because it does not state with

precision all elements that give rise to a legal basis for recovery. *Schmedding v. Tnemec Co., Inc.*, 187 F.3d 862 (8th Cir. 1999). As a practical matter, dismissal under rule 12(b)(6) should be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief. See *id.*

## IV. ANALYSIS

The term "surface water" encompasses all waters found on the earth's surface. Richard S. Harnsberger & Norman W. Thorson, Nebraska Water Law & Administration § 1.04 at 9-10 (Butterworth Legal Publishers 1984). Here, the surface water is the stream on which Spear T has water appropriations. In contrast, ground water is defined as " 'that water which occurs or moves, seeps, filters, or percolates through the ground under the surface of the land.' " *Id.* at 12. Accord Neb. Rev. Stat. § 46-635 (Reissue 2004).

Hydrologically, ground water and surface water are inextricably related. Ground water pumping can cause diminished streamflows. Streamflow can support the potential for subirrigation. Seepage from surface water supplies canals, and deep percolation of applied irrigation water from surface projects can recharge ground water aquifers. Harnsberger & Thorson, *supra*, § 5.30. Water law commentators have colorfully described this phenomenon: "[A]ll water is interrelated and interdependent. If groundwater were red, most streams would be various shades of pink; if groundwater were poisoned, the streams would also be poisoned." Richard S. Harnsberger et al., *Groundwater: From Windmills to Comprehensive Public Management*, 52 Neb. L. Rev. 179, 183 (1973).

But Nebraska water law ignores the hydrological fact that ground water and surface water are inextricably linked. Instead of an integrated system, we have two separate systems, one allocating streamflows and the other allocating ground water. Under constitutional and statutory provisions, streamflows are allocated by priority in time. See Neb. Const. art. XV, § 6. Ground water, in contrast, is governed by a common-law rule of reasonableness and the GWMPA. Moreover, the lack of an integrated system is reinforced by the fact that different agencies regulate

ground water and surface water. The Department of Natural Resources regulates surface water appropriations. See Neb. Rev. Stat. § 61-201 et seq. (Reissue 2003 & Cum. Supp. 2004). In contrast, under the GWMPA, ground water is statutorily regulated by each Natural Resources District (NRD).

The tension between the two systems has long been recognized by commentators. See Harnsberger et al., *supra* at 182 ("[g]round and stream diverters in Nebraska are on a collision course which may occur sooner than most people think"). That day has arrived.

### 1. DOES SPEAR T HAVE COMMON-LAW CLAIM AGAINST APPELLEES?

We begin by determining whether Spear T has stated a claim. Spear T argues that it has stated a claim based either on the statutory rule of prior appropriation of surface water or on the tort of conversion; we reject these arguments. But as we explain below, we determine that the common law does recognize a tort claim by a surface water appropriator against a ground water user and that Spear T's complaint could be amended to state a claim.

### (a) Prior Appropriation

As noted, under constitutional and statutory provisions, streamflows are allocated by priority in time. In its first attempt to state a claim, Spear T relies on prior appropriation. Spear T argues that because the water is hydrologically connected and because it has a prior surface water appropriation, it has priority to the water. According to Spear T, the water is all one "stream" and, as such, Spear T's prior appropriation takes priority over other users of the water, including those who withdraw the water from under its lands. Thus, Spear T essentially asks this court to apply legislatively created surface water priorities to ground water use without considering existing common-law rules. We decline to adopt this approach for several reasons.

First, an application of surface water priorities to ground water requires this court to agree with a legal fiction that considers the ground water to be an "underground stream." We take as true that the water is hydrologically connected, but water rarely runs in a true underground stream. See Richard S. Harnsberger & Norman W. Thorson, Nebraska Water Law & Administration § 1.07 at

13-14 (Butterworth Legal Publishers 1984). Adherence to such a view ignores reality.

Second, no statutory or case law authority supports applying surface water appropriations to ground water. We recognize that most legislatures in western states have developed comprehensive appropriation systems overseen by administrative agencies. See Restatement (Second) of Torts, ch. 41, topic 4 (1979). But in Nebraska, the Legislature has not developed an appropriation system that addresses direct conflicts between users of surface and ground water that is hydrologically connected.

■ Finally, the prior appropriation rule that Spear T advocates would give first-in-time surface water appropriators the right to use whatever water they want to the exclusion of later-in-time ground water users. This could have the effect of shutting down all wells in any area where surface water appropriations are hydrologically connected to ground water. Richard S. Harnsberger et al., *Groundwater: From Windmills to Comprehensive Public Management*, 52 Neb. L. Rev. 179, 248 (1973) ("[i]f the doctrine of prior appropriation [was] carried to [its] logical conclusion, all Nebraska wells would be shut down"). This would unreasonably deprive many ground water users. Accordingly, we decline to apply the statutory surface water appropriation rules to conflicts between surface and ground water users.

## (b) Conversion

■ Next, Spear T contends that it has stated a claim for conversion. Tortious conversion is any distinct act of dominion wrongfully asserted over another's property in denial of or inconsistent with that person's rights. *Baye v. Airlite Plastics Co.*, 260 Neb. 385, 618 N.W.2d 145 (2000).

■ A right to appropriate surface water however, is not an ownership of property. Instead, the water is viewed as a public want and the appropriation is a right to use the water. As one article has stated in reference to ground water: "Trespass is unavailable in a typical well interference case because a physical invasion of the plaintiff's property is lacking. Similarly, an action in conversion is unavailable, since the plaintiff has no private property interest in groundwater, at least not prior to capture." Harnsberger

& Thorson, *supra*, § 5.27 at 266-67, citing *State ex rel. Douglas v. Sporhase*, 208 Neb. 703, 305 N.W.2d 614 (1981), *reversed on other grounds* 458 U.S. 941, 102 S. Ct. 3456, 73 L. Ed. 2d 1254 (1982). Because Spear T does not have a property interest in its surface water appropriation and only has a right to use, it cannot state a claim for conversion or trespass.

### (c) Has Spear T Stated Claim Under Other Common-Law Doctrines or, Alternatively, Should It Be Given Leave to Amend?

Although Spear T cannot state a claim under the statutory surface water appropriation rules or for the tort of conversion, this does not end our analysis. The question remains whether it has stated a claim under other common-law principles or if it should be allowed leave to amend to state such a claim.

### (i) Review of Common-Law Rules

We begin by reviewing common-law rules that courts have employed to adjudicate disputes between water users.

### a. English Rule

Under the English rule of water law—also referred to as the absolute ownership rule—a landowner had absolute ownership of the waters under his or her land. Therefore, the owner could withdraw any quantity of water for any purpose without liability, even though the result was to drain water from beneath surrounding lands. *Prather v. Eisenmann*, 200 Neb. 1, 261 N.W.2d 766 (1978). See, also, *Cline v. American Aggregates*, 15 Ohio St. 3d 384, 474 N.E.2d 324 (1984).

The English rule was predicated on protection for the property rights of landowners whose activities resulted in ground water diversion. See, *Cline v. American Aggregates, supra*; Restatement (Second) of Torts § 858 (1979) (describing English rule). The basis for the rule has also been described as a "feeling that the ways of underground water were too mysterious and unpredictable to allow the establishment of adequate and fair rules for regulation of competing rights to such water." *State v. Michels Pipeline Construction, Inc.*, 63 Wis. 2d 278, 290-91, 217 N.W.2d 339, 344 (1974). Thus, the English courts adopted the position

that everyone was permitted to take and use all the ground water of which they could get possession. *Id.*

Most American courts, however, have criticized the English rule, recognizing that the rule protected landowners from liability even when water was diverted for malicious purposes. *Maerz v U S Steel Corp*, 116 Mich. App. 710, 323 N.W.2d 524 (1982), citing *Huber v. Merkel*, 117 Wis. 355, 94 N.W. 354 (1903). The rule has also been criticized because, although a landowner theoretically had a property right in waters beneath his or her land, the overlying owner with the deepest well or largest pump could control water that would otherwise be available to all. *Maerz v U S Steel Corp, supra.* See, also, *Cline v. American Aggregates, supra*; *Meeker v. East Orange*, 77 N.J.L. 623, 74 A. 379 (1909).

An extreme minority of jurisdictions still adheres to the English rule or a rule that has the same effect as the English rule. See, *Maddocks v. Giles*, 728 A.2d 150 (Me. 1999); *Sipriano v. Great Spring Waters of America*, 1 S.W.3d 75 (Tex. 1999). These jurisdictions refuse to apply to ground water the rules applicable to surface water and treat ground water as an entirely separate and unconnected resource that may be used at will by the owner of the overlying land. In each case, the court recognized problems with the reasoning behind the English rule, but in *Maddocks*, the court deferred to the legislature, which was already taking some action. Likewise, in *Sipriano*, a constitutional amendment placed the regulation of water in the legislature's hands.

### b. American Rule

Because of disagreement with the English rule, American courts have modified it in different ways. Under what is termed the "American rule" of water law, the owner of the land is entitled to appropriate subterranean or other waters accumulating on the land, but cannot extract and appropriate them in excess of a reasonable and beneficial use of land, especially if the exercise of such use is injurious to others. *Prather v. Eisenmann, supra.*

Under the American rule, the term "reasonable use" relates to the manner in which water is used upon the appropriator's land. The adjacent landowners' interests are in issue only when the appropriator uses water in excess of the reasonable and beneficial use of it upon his or her land and that excess use is

injurious to the adjacent landowner. *Prather v. Eisenmann*, 200 Neb. 1, 261 N.W.2d 766 (1978). The American rule has at times also been referred to as a rule of "reasonable use," although it does not consider a balancing of the parties' interests. Thus, one court has stated:

> This [reasonable use] designation is unfortunate and in no small measure responsible for the confusion concerning the rule. If applied to this rule, the words *reasonable use* cannot be given their inherent broad meaning of a use reasonable under all the circumstances. Instead, the words must be given the contrived meaning of a use reasonably related to enjoyment of the land from which the waters are taken.

*Maerz v U S Steel Corp*, 116 Mich. App. at 715 n.2, 323 N.W.2d at 527 n.2.

Under the American rule, a person who is deprived of surface water because of the use of ground water by a nearby landowner will recover only when the water was not used for a beneficial purpose on the ground water user's land.

### c. Correlative Rights

The correlative rights rule of water law originated in California and provides that the rights of all landowners over a common aquifer are coequal or correlative and that one cannot extract more than his or her share of the water even for use on his or her own land if other's rights are injured by the withdrawal. *Prather v. Eisenmann, supra.* The rule first arose in *Katz v. Walkinshaw*, 141 Cal. 116, 70 P. 663 (1902). Under the rule, the overlying landowners have no proprietary interest in the water under their ground and each owner over a common pool has a correlative right to make a beneficial use of the water on his or her land. Priority of use is irrelevant because in times of shortage, the common supply is apportioned among the landowners based on their reasonable needs. Richard S. Harnsberger et al., *Groundwater: From Windmills to Comprehensive Public Management*, 52 Neb. L. Rev. 179 (1973) (describing correlative rights rule).

The principal difficulty with the correlative rights rule is how to allocate the water, and courts have approached the question in different ways. See *id.* For example, some courts interpret the

correlative rights rule as essentially the same as the Restatement view described below. See *Maddocks v. Giles*, 728 A.2d 150 (Me. 1999). Others view the rule as providing apportionment in times only when there is an insufficient supply for all users. See *State v. Michels Pipeline Construction, Inc.*, 63 Wis. 2d 278, 217 N.W.2d 339 (1974).

Some courts, however, have adopted a reasonable use rule that combines the American rule and correlative rights rule. Under such rules, reasonableness is determined by both the use of the water and the rights of other landowners. Such cases still refer to correlative rights, but differ from the California doctrine. See *id.*

### d. Restatement

The Restatement (Second) of Torts § 858 (1979) essentially adopts a correlative rights rule that allows for a balancing of many factors to determine reasonableness. Although the rule is initially stated in terms of "reasonable use" similar to the American rule, it adds exceptions that draw on principles of correlative rights. The Restatement rule finds its support in principles of nuisance law and has been suggested as the basic framework for well interference cases. See Richard S. Harnsberger & Norman W. Thorson, Nebraska Water Law & Administration § 5.27 (Butterworth Legal Publishers 1984).

The Restatement, § 858 at 258, states in part as follows:

(1) A proprietor of land or his grantee who withdraws ground water from the land and uses it for a beneficial purpose is not subject to liability for interference with the use of water by another, unless

(a) the withdrawal of ground water unreasonably causes harm to a proprietor of neighboring land through lowering the water table or reducing artesian pressure,

(b) the withdrawal of ground water exceeds the proprietor's reasonable share of the annual supply or total store of ground water, or

(c) the withdrawal of the ground water has a direct and substantial effect upon a watercourse or lake and unreasonably causes harm to a person entitled to the use of its water.

Although § 858 is under chapter 41, topic 4, entitled "Interference With the Use of Water," *id.* at 253, a note on that

topic's scope shows that it is intended to apply to water that is hydrologically connected to ground water. The note states in part: "This Topic covers the rights and liabilities of possessors of land and others withdrawing ground water. It also states the rules governing the rights and liabilities of persons using water where ground water is interconnected with the water of watercourses and lakes." *Id.* Several courts have adopted the Restatement approach. *Cline v. American Aggregates*, 15 Ohio St. 3d 384, 474 N.E.2d 324 (1984); *State v. Michels Pipeline Construction, Inc., supra; Maerz v U S Steel Corp*, 116 Mich. App. 710, 323 N.W.2d 524 (1982).

In addition, the Restatement keeps older definitions of ground water and surface water, but abandons any common-law distinctions between underground watercourses and percolating water. Ground water is defined as "water that naturally lies or flows under the surface of the earth." Restatement, *supra*, § 845 at 198. See, also, *Maddocks v. Giles*, 728 A.2d 150 (Me. 1999). Comment *b*. of the Restatement, *supra*, recognizes that ground water may be connected to other forms of water. The comment states: "Most ground water is moving in the hydrologic cycle. It originates from infiltration of precipitation and inflow of streams; it discharges into springs, streams, lakes and oceans. Some ground water is sidetracked from the cycle in closed basins where geologic formations isolate it from recharge or discharge." *Id.* at 199.

Although the Restatement rule is derived from principles of reasonable use, the rule differs from the American rule because it balances the equities and hardships between competing users. *Maddocks v. Giles, supra.* The Restatement (Second) of Torts § 858, comment *b*. at 259 (1979), notes in part:

> The general rule is phrased in terms of nonliability in order to carry forward the policy of encouraging ground water use by permitting more or less unrestricted development of the resource by those who have access to it. The policy and the rule are justified by the fact that since most ground water basins are very large and contain vast quantities of water, it is usually impossible for a single water user to capture the entire supply and leave no water for others.

Comment *c*. at 259-60 provides:

Exceptions to the general rule are stated in Clauses (a), (b), and (c) of Subsection (1). They incorporate all grounds of liability for use of ground water recognized by the common law but remove some of the restrictions contained in those rules of liability. The majority "American rule of reasonable use" . . . was phrased in terms of the overlying landowner's right to capture ground water, limited by restrictions on the place of use of the water. In operation this protected small wells for domestic and agricultural uses from the harmful effects of large wells for municipal and industrial supply. The first exception to nonliability, contained in Clause (1)(a), continues this protection but follows a modern tendency to extend similar protection to cases of harm done by unreasonably large withdrawals for operations conducted on overlying lands.

The second exception, Clause (1)(b), imposes liability upon a landowner who withdraws more than his reasonable share of the common supply. This has always been a possible outcome of a controversy concerning ground water if the source could be classified as an underground stream or if the rule of correlative rights were applied. The concept of underground streams was unscientific and its application could be quite arbitrary and the applicability of the rule of correlative rights was in doubt in many states. This exception merges the two rules and makes it possible to apportion shares of the water in the source to the owners of overlying land whenever total withdrawals reach such magnitude that it is necessary to protect the share of an individual landowner from appropriation by others.

The last exception, Clause (1)(c), restates the conditions for recognizing that ground water and surface water are often closely interrelated and should be treated as a single source. In the past this took many forms. Withdrawals of ground water have been called unreasonable when they reduced the flow of springs. A variant of the underground stream concept has enabled the courts to regulate some ground water as the underground segment of a surface stream. The part of an aquifer in contact with the bed and banks of a stream has been called the underflow of the stream and treated as part of

it. This Section substitutes a pragmatic test for determining the interconnection instead of employing these doubtful and unscientific categorizations.

Thus, under the Restatement, reasonableness of use is determined on a case-by-case basis and many factors can be considered; the test is flexible. The test for reasonableness is provided in the Restatement:

The determination of the reasonableness of a use of water depends upon a consideration of the interests of the riparian proprietor making the use, of any riparian proprietor harmed by it and of society as a whole. Factors that affect the determination include the following:

(a) The purpose of the use,

(b) the suitability of the use to the watercourse or lake,

(c) the economic value of the use,

(d) the social value of the use,

(e) the extent and amount of harm it causes,

(f) the practicality of avoiding the harm by adjusting the use or method of use of one proprietor or the other,

(g) the practicality of adjusting the quantity of water used by each proprietor,

(h) the protection of existing values of water uses, land, investments and enterprises, and

(i) the justice of requiring the user causing harm to bear the loss.

Restatement (Second) of Torts § 850A at 220 (1979).

### e. Common-Law Claims in Disputes Between Ground Water Users in Nebraska

We have never been confronted with whether a surface water appropriator may bring a common-law claim against the user of hydrologically connected ground water. We have, however, recognized that a ground water user may bring a common-law claim against another ground water user. We generally have stated the common law in a manner consistent with the American rule blended with a rule of correlative rights. For example, we have stated:

[T]he owner of land is entitled to appropriate subterranean waters found under his land, but he cannot extract and appropriate them in excess of a reasonable and beneficial use upon

the land which he owns, especially if such use is injurious to others who have substantial rights to the waters, and if the natural underground supply is insufficient for all owners, each is entitled to a reasonable proportion of the whole, and while a lesser number of states have adopted this rule, it is in our opinion, supported by the better reasoning.

*Olson v. City of Wahoo*, 124 Neb. 802, 811, 248 N.W. 304, 308 (1933). See, also, *Metropolitan Utilities Dist. v. Merritt Beach Co.*, 179 Neb. 783, 140 N.W.2d 626 (1966); *Luchsinger v. Loup River Public Power District*, 140 Neb. 179, 299 N.W. 549 (1941); *Osterman v. Central Nebraska Public Power and Irrigation District*, 131 Neb. 356, 268 N.W. 334 (1936), *overruled on other grounds, Wasserburger v. Coffee*, 180 Neb. 149, 141 N.W.2d 738 (1966). We have also discussed, but never applied, the Restatement, *supra. Prather v. Eisenmann*, 200 Neb. 1, 261 N.W.2d 766 (1978).

### (ii) Adoption of Restatement for Disputes Between Surface Water Users and Ground Water Users

Having reviewed the common-law rules, we now consider whether we will recognize a common-law claim for interference with surface water by the user of hydrologically connected ground water.

Initially, we reject a rule that would bar a surface water appropriator from recovering in all situations. Such a rule would ignore the hydrological fact that a ground water user's actions may have significant, negative consequences for surface water appropriators.

Instead, the common law should acknowledge and attempt to balance the competing equities of ground water users and surface water appropriators; the Restatement approach best accomplishes this. The Restatement recognizes that ground water and surface water are interconnected and that in determining the rights and liabilities of competing users, the fact finder needs broad discretion. Thus, when applying the Restatement, the fact finder has flexibility to consider many factors such as those listed in § 850A, along with other factors that could affect a determination of reasonable use.

Adoption of the Restatement is the modern trend. See, *Cline v. American Aggregates*, 15 Ohio St. 3d 384, 474 N.E.2d 324

(1984); *State v. Michels Pipeline Construction, Inc.*, 63 Wis. 2d 278, 217 N.W.2d 339 (1974); *Maerz v U S Steel Corp*, 116 Mich. App. 710, 323 N.W.2d 524 (1982). Further, commentators have recommended the adoption of the Restatement to both this court and the Legislature. See Richard S. Harnsberger et al., *Groundwater: From Windmills to Comprehensive Public Management*, 52 Neb. L. Rev. 179 (1973).

Accordingly, we adopt the Restatement to govern conflicts between users of hydrologically connected surface water and ground water. Specifically, we hold:

> A proprietor of land or his [or her] grantee·who withdraws ground water from the land and uses it for a beneficial purpose is not subject to liability for interference with the use of water of another, unless . . . the withdrawal of the ground water has a direct and substantial effect upon a watercourse or lake and unreasonably causes harm to a person entitled to the use of its water.

Restatement (Second) of Torts § 858(1)(c) at 258 (1979). Whether a ground water user has unreasonably caused harm to a surface water user is decided on a case-by-case basis. In making the reasonableness determination, the Restatement, *supra*, § 850A, provides a valuable guide, but we emphasize that the test is flexible and that a trial court should consider any factors it deems relevant.

We digress momentarily to offer a word of caution. Although the issue of available remedies is not yet before us, courts should be cautious when considering remedies for interference with surface water. For example, because the recharge of a stream that has dried up because of well pumping could take years, an injunction against pumping might only serve to deprive everyone in a water basin. Such a remedy would be unreasonable and inequitable. Likewise, a court can consider a surface water appropriator's ability to obtain an exception to stays on drilling new wells, or any additional programs that might provide relief.

### (iii) Has Spear T Stated Claim Under Restatement?

Having adopted the Restatement approach, we next consider whether Spear T has stated a claim upon which relief can be granted. Our review of Spear T's complaint shows that it did allege—although not precisely—that the appellees' withdrawal of

ground water has directly and substantially affected Pumpkin Creek. However, although Spear T alleged that it has suffered harm, it did not allege that the appellees have unreasonably caused that harm. Thus, Spear T has failed to state a claim upon which relief can be granted.

We determine, however, that Spear T should be allowed to amend its complaint. Leave to amend should be granted liberally when justice so requires. *Frey v. City of Herculaneum*, 44 F.3d 667 (8th Cir. 1995). Accordingly, we determine that the district court erred when it dismissed Spear T's complaint with prejudice for failure to state a claim.

## 2. ABROGATION

Having concluded that a common-law claim exists and that Spear T could amend its claim, we turn to the appellees' contention that by passing the GWMPA, the Legislature has abrogated the common-law claim. We have also asked the parties to brief whether 2004 Neb. Laws, L.B. 962, has abrogated any common-law claim.

### (a) GWMPA

The Legislature is free to create and abolish rights as long as no vested right is disturbed. *Colton v. Dewey*, 212 Neb. 126, 321 N.W.2d 913 (1982). But statutes which change or take away a common-law right must be strictly construed. Any statutory construction restricting or abolishing common-law rights should not be adopted, unless the plain words of the statute compel such result. *Macku v. Drackett Products Co.*, 216 Neb. 176, 343 N.W.2d 58 (1984).

Nothing in the GWMPA expressly abrogates a common-law claim by a surface water user against a ground water user. Thus, any abrogation would have to be plainly compelled by the operation of the GWMPA.

We begin with the findings that the Legislature made in support of the GWMPA. The GWMPA initially states in part at § 46-656.02:

> The Legislature finds that ground water is one of the most valuable natural resources in the state and that an adequate supply of ground water is essential to the general welfare of

the citizens of this state and to the present and future development of agriculture in the state. The Legislature recognizes its duty to define broad policy goals concerning the utilization and management of ground water and to ensure local implementation of those goals.

*Every landowner shall be entitled to a reasonable and beneficial use of the ground water underlying his or her land subject to the provisions of Chapter 46, article 6, and the Nebraska Ground Water Management and Protection Act and the correlative rights of other landowners when the ground water supply is insufficient for all users.* The Legislature determines that the goal shall be to extend ground water reservoir life to the greatest extent practicable consistent with beneficial use of the ground water and best management practices.

The Legislature further recognizes and declares that the management, protection, and conservation of ground water and the beneficial use thereof are essential to the economic prosperity and future well-being of the state and that the public interest demands procedures for the implementation of management practices to conserve and protect ground water supplies and to prevent the contamination or inefficient or improper use thereof. The Legislature recognizes the need to provide for orderly management systems in areas where management of ground water is necessary to achieve locally determined ground water management objectives and where available data, evidence, or other information indicates that present or potential ground water conditions, including subirrigation conditions, require the designation of areas with special regulation of development and use.

(Emphasis supplied.) The Legislature further provided at § 46-656.05:

(1) The management, conservation, and beneficial use of hydrologically connected ground water and surface water are essential to the continued economic prosperity and well-being of the state, including the present and future development of agriculture in the state;

(2) Hydrologically connected ground water and surface water may need to be managed differently from unconnected

ground water and surface water in order to permit equity among water users and to optimize the beneficial use of interrelated ground water and surface water supplies;

(3) Natural resources districts already have significant legal authority to regulate activities which contribute to declines in ground water levels and to nonpoint source contamination of ground water and are the preferred entities to regulate, through ground water management areas, ground water related activities which are contributing to or are, in the reasonably foreseeable future, likely to contribute to conflicts between ground water users and surface water appropriators or which may be necessary in order to resolve disputes over interstate compacts or decrees, or to carry out the provisions of other formal state contracts or agreements;

(4) The Department of Natural Resources is responsible for regulation of water resources and local surface water project sponsors are responsible for much of the structured irrigation utilizing surface water supplies, and these entities should be responsible for regulation of surface water related activities which contribute to such conflicts or provide opportunities for such dispute resolution;

. . . .

(6) All involved natural resources districts, the department, and surface water project sponsors should cooperate and collaborate on the identification and implementation of management solutions to such conflicts or provide opportunities for mitigation or elimination of such disputes or difficulties.

These legislative findings do not indicate an intent to abrogate the common law. In fact, the language that we have italicized in § 46-656.02 indicates that, at least concerning disputes between multiple ground water users, the Legislature was aware of and meant to preserve the common law.

Further, if the Legislature wanted to preempt a common-law claim, then the GWMPA would contain adjudicative procedures and remedies designed to resolve individual disputes between water users. But that is not the case. Instead, a review of the GWMPA shows that it contains procedures meant to identify

areas where water issues exist and to create general regulations to address those issues.

To address issues involving the quantity and quality of ground water, the GWMPA requires the NRD's to prepare a ground water management plan. § 46-656.12. The plan's purpose is to set out each NRD's broad policy goals. In the plan, the NRD's are to set out their ground water supplies and needs. In addition, the NRD's are required to set out any proposals for conservation and or supply augmentation, as well as any proposed management areas. Once an NRD completes its management plan, the Department of Natural Resources (hereinafter Department) reviews it for approval. § 46-656.14. If the Department denies approval, then the NRD may either amend the plan or keep it the same. It must then submit the amended or original plan to the Department with explanations on how the changes, if any, have met the Department's concerns. § 46-656.15.

Once the Department has approved the management plan or the NRD has complied with § 46-656.15, the NRD may create a management area within the NRD, but it is not required to do so. The procedures for creating and modifying a management area are set out in §§ 46-656.19 through 46-656.21. After a public hearing on whether to create a management area, the NRD must determine whether to do so. If it decides to create the management area, then the GWMPA provides that it shall adopt a control from a list in § 46-656.25. This list, however, is not specifically tailored to adjudicate conflicts between ground water users and surface water appropriators. Instead, it contains a list of regulatory suggestions that can be used to meet an array of water issues.

In fact, the only provision of the GWMPA that might be construed as addressing individual conflicts between ground water users and surface water appropriators is § 46-656.28. But we do not read this as abrogating a common-law claim that a surface water user might have against a ground water user. Under § 46-656.28(1):

> If a district on its own motion or following a request by a *surface water appropriator*, surface water project sponsor, *ground water user*, the Department of Natural Resources, or another state agency has reason to believe that a management

area should be designated for integrated management of hydrologically connected ground water and surface water or that controls in a management area should be adopted to include such integrated management, the district *may* utilize the procedures established in sections 46-656.19 to 46-656.21 or may request that the affected appropriators, the affected surface water project sponsors, and the Department of Natural Resources consult with the district and that studies and a hearing be held on the preparation of a joint action plan for the integrated management of hydrologically connected ground water and surface water.

Thus, under this section, surface water appropriators and ground water users can request that the NRD take action concerning disputes arising out of hydrologically connected ground water.

But § 46-656.28(1) is ambiguous as to what happens once a party requests that an NRD take action. The statute may be read in several ways. First, it could allow the NRD discretion to (1) use §§ 46-656.19 to 46-656.21 to either create a management area and adopt controls or modify controls in an existing management area, (2) begin the process for adopting a joint action plan under the remainder of § 46-656.28, or (3) do nothing. Alternatively, § 46-656.28(1) could be read to mean that if the NRD concludes there is a problem, then it must either (1) use §§ 46-656.19 to 46-656.21 to either create a management area and adopt controls or modify controls in an existing management area or (2) begin the process for adopting a joint action plan.

But regardless whether § 46-656.28 gives the NRD discretion or requires the implementation of a management area, the statute does not, as the appellees suggest, provide a surface water user with an administrative adjudication. Instead, it provides a method for the surface water user to commence administrative rulemaking. If, following a request by the surface water user, the NRD chooses to create a management plan, the goal is not to adjudicate a specific dispute with trial proceedings, but to develop controls to address the area's water problems by employing the traditional tools of rulemaking, i.e., studies and public meetings. The same is true if the NRD begins the process of creating a joint action plan, except that if the NRD chooses this route, the Department is also involved.

Moreover, regardless of which process is chosen, § 46-656.28 does not authorize the NRD or the Department to remedy any past harm done to a complaining party. The steps that the NRD and the Department can take are only prospective: This is consistent with rulemaking, not adjudication, and further demonstrates that § 46-656.28 does not abrogate the common law.

To the extent there is ambiguity regarding the GWMPA, the legislative history also shows that the Legislature did not intend for the GWMPA to abrogate a common-law claim. The GWMPA was significantly revised in 1996 to address the relationship between surface and ground water in response to concerns that the State of Kansas might file a lawsuit over issues arising from the Republican River Compact. A reading of the history as a whole shows that the concern was implementing a system that could reduce future conflicts. Nothing indicates an intent for the GWMPA to replace common-law tort actions or to provide a procedure to address disputes between individual parties. Instead, the intent was to allow the NRD greater flexibility to create plans in areas of conflict and create cooperation between the NRD's and the Department when necessary, but not to resolve specific existing conflicts. See, e.g., Floor Debate, 1996 Neb. Laws, L.B. 108, 94th Leg., 2d Sess. (Mar. 13, 1996). In the floor debate, it was recognized that "litigation . . . is out there, and the lawsuits are going to happen or not happen, separate and apart from the legislation . . . in 108." *Id.* at 12772. After a discussion recognizing that a person harmed by ground water use could sue, it was noted that the Legislature's goal was to mitigate litigation, but there was no discussion of abrogating claims. Instead, when asked about compensation for harm, the senator introducing the bill stated:

> [T]he question of compensation is something that is beyond this bill. The council approached it several times and was unable to address it. My position has been what we need to do now is to take care of the conjunctive use problem. If there are significant groups that are interested in talking about the whole question of compensation and who should be compensated when, that's certainly one I'd be willing to sit down and help organize and look at, but you have some very complicated questions there.

*Id.* at 12816.

Thus, we determine that the GWMPA does not show either an express or implied abrogation of the common law. Although we believe the GWMPA is a step toward reducing future conflicts through general regulation and not an attempt to replace a common-law claim with a system of administrative adjudication, we do not intend to discourage the Legislature from acting in this area. Ideally, the Legislature would develop a comprehensive administrative appropriation system, including procedures and remedies, to adjudicate direct conflicts between ground water and surface water users in Nebraska. This would be consistent with how most legislatures in western states have addressed conflicts between water users. See Restatement (Second) of Torts, ch. 41, topic 4 (1979).

### (b) L.B. 962

We asked the parties to also address 2004 Neb. Laws, L.B. 962, which allows further action by the NRD's and the Department to regulate ground water pumping and avoid overpumping in areas where depletion of surface water is a concern. Although we note that L.B. 962 takes further steps to help prevent conflicts, we do not address the application of L.B. 962 because the act does not operate retroactively and, thus, does not affect this appeal.

### 3. PRIMARY JURISDICTION

Next, we consider the appellees' argument that the rule of primary jurisdiction requires this court to defer to the NRD before determining the issues presented in this appeal. The appellees' arguments on this issue are blurred. In their supplemental brief, the appellees contend that this court should defer deciding the issues presented and allow the NRD to decide them. The appellees, however, concede in their brief that the appeal involves questions of law that are not subject to the primary jurisdiction doctrine. Thus, the parties appear to agree that this court must decide what, if any, claim is available. But the appellees argue that issues of remedies for any given claim should be decided by the NRD, stating:

> Appellees' reliance upon the doctrine of primary jurisdiction relates more specifically to the second level of inquiry when evaluating the questions at hand. That level of inquiry relates to the nature of the remedies that are available to surface water users (or other ground water users) when the

water supply in a particular basin . . . is inadequate for all of the demands. The primary jurisdiction doctrine requires that the resolution of the technical matters associated with the relative rights of surface water users and ground water users be made by the agencies that have the special competence, or administrative expertise, to make such decisions.

Consolidated supplemental brief for appellees at 23.

The primary jurisdiction doctrine applies whenever enforcement of a claim, originally cognizable in the courts, requires the resolution of issues that have been placed within the special competence of an administrative body in accordance with the purposes of a regulatory scheme. *In re Interest of Battiato*, 259 Neb. 829, 613 N.W.2d 12 (2000). Whether the purposes of the administrative act require that the administrative agency should first pass on a question depends on whether the question raises policy issues that should be considered by the administrative agency in the interests of uniformity and administrative expertise. *Id.*

Application of the primary jurisdiction doctrine does not excuse the court from deciding the issue. Instead, it delays the process pending referral of the issues to the administrative body for its views. See, e.g., *People v. Fremont Energy Corp.*, 651 P.2d 802 (Wyo. 1982). The controverted question and the inquiry necessary for its solution are the determining factors. *In re Interest of Battiato, supra.* But of most importance, the doctrine does not apply when a pure question of law is at issue. *Id.*

Moreover, courts commonly hold that actions seeking damages for nuisance or other common-law tort actions for impairment of water rights are traditionally cognizable by the courts without reference to agency expertise or discretion. Accordingly, exercise of the primary jurisdiction doctrine is inappropriate in those cases. See, e.g., *Freels v. Northrup*, 678 S.W.2d 55 (Tenn. 1984); *G & A Contractors, Inc. v. Alaska Greenhouses, Inc.*, 517 P.2d 1379 (Alaska 1974).

Here, applying the primary jurisdiction doctrine is inappropriate for a number of reasons. First, as the appellees admit, the present appeal involves issues of law that are not subject to the primary jurisdiction doctrine. The primary issue in the action is

whether a common-law claim has been stated. Such a determination is appropriately made by the court.

Further, to the extent the appellees contend that the NRD should determine the remedy, the issue of appropriate remedy is not before this court. But, if it were, applying the primary jurisdiction doctrine would be inappropriate. The determination of facts and award of damages, an injunction, or other equitable remedy for a common-law tort or equity action is in the province of the judicial system. See *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003) (issue of available remedies is question of law). Moreover, as we discussed in the abrogation portion of our analysis, there is no statutory requirement that the NRD's provide a remedy to a surface water appropriator who has been denied water because of the use of ground water. In particular, there is no statutory authority for the NRD's to award damages. At most, the GWMPA appears to allow the NRD's the ability to take regulatory action to prevent future conflicts, and to issue cease and desist orders to enforce those regulations.

Moreover, policy considerations also make the application of the primary jurisdiction doctrine inappropriate. One of the principle considerations of the doctrine is to avoid inconsistent results. With 23 NRD's in Nebraska, all of which consist of elected officials, applying the primary jurisdiction doctrine would allow for the future possibility of up to 23 different rules and remedies in Nebraska for interference with surface water by a ground water user. See Nebraska Blue Book 2002-03 at 919-21. Instead of deferring jurisdiction to NRD's who might act inconsistently and apply differing rules, it is better to allow the courts, which are bound by legal precedent, to try the actions. Because of the questions of law involved and the lack of statutory authority to provide all forms of relief prayed for in the complaint, exercise of the primary jurisdiction doctrine is inappropriate.

### 4. JOINDER OF PARTIES

Spear T alleges that the district court erred when it dismissed for failure to join all necessary parties. The appellees argue that all well users in the Pumpkin Creek basin must be joined in the lawsuit.

 The presence of necessary parties to a suit is a jurisdictional matter and cannot be waived by the parties; it is the duty of the plaintiff to join all persons who have or claim any interest which could be affected by the judgment. *Robertson v. School Dist. No. 17*, 252 Neb. 103, 560 N.W.2d 469 (1997); *Hoiengs v. County of Adams*, 245 Neb. 877, 516 N.W.2d 223 (1994). An indispensable or necessary party to a suit is one who has an interest in the controversy to an extent that such party's absence from the proceedings prevents a court from making a final determination concerning the controversy without affecting such party's interest. See, Neb. Rev. Stat. § 25-323 (Cum. Supp. 2004); *Robertson v. School Dist. No. 17, supra*; *Calabro v. City of Omaha*, 247 Neb. 955, 531 N.W.2d 541 (1995).

 A plaintiff, however, need not join all tort-feasors as defendants in an action for damages. Every joint tort-feasor is liable for all damages to which his or her conduct has contributed, and it is no defense that these damages would not have occurred without the concurring misconduct of another person. *Battle Creek State Bank v. Preusker*, 253 Neb. 502, 571 N.W.2d 294 (1997).

We determine that all well users in the basin are not indispensable parties who would need to be joined to satisfy jurisdiction. Accordingly, the district court erred when it dismissed the complaint with prejudice for failure to join necessary parties.

## V. CONCLUSION

We adopt Restatement (Second) of Torts §§ 858 and 850A (1979) for resolving disputes between users of hydrologically connected ground water and surface water. Because we adopt the Restatement, we determine that the district court erred when it dismissed the complaint with prejudice for failure to state a claim. Although Spear T did not precisely state a claim under the Restatement, it should be provided the opportunity to amend its complaint to state a claim. We further determine that the district court erred when it dismissed the complaint for lack of subject-matter jurisdiction and failure to join necessary parties. Accordingly, we reverse, and remand for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.