LOREN W. KOCH, APPELLEE AND CROSS-APPELLANT, V.
RONALD E. AUPPERLE AND MARY ANN AUPPERLE, APPELLANTS,
AND LOWER PLATTE SOUTH NATURAL RESOURCES DISTRICT,
INTERVENOR-APPELLANT AND CROSS-APPELLEE.

737 N.W.2d 869

Filed August 3, 2007.    No. S-06-264.

Steven G. Seglin and Thomas E. Jeffers, of Crosby Guenzel, L.L.P., for appellants and intervenor-appellant.

Stephen D. Mossman, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.
This case involves a water dispute between neighboring land-owners. Ronald E. Aupperle and Mary Ann Aupperle, with

the cooperation of the Lower Platte South Natural Resources District (LPSNRD), commenced construction of a small dam to create a farm pond along the banks of an unnamed tributary of Weeping Water Creek in Cass County, Nebraska. Loren W. Koch, a downstream user of the waters of the tributary, sought to enjoin the construction of the dam, and LPSNRD intervened. After a bench trial, the district court for Cass County enjoined the Aupperles from constructing the dam without a device to permit water to pass through the dam so as not to "appreciably diminish" the water which would naturally flow onto Koch's property or materially affect the continuity of such flow. The Aupperles and LPSNRD appeal. Based upon our de novo review, we conclude that Koch was not entitled to injunctive relief.

## I. BACKGROUND

In June 2005, Koch filed an action to enjoin the Aupperles from constructing a dam to create a small farm pond on the unnamed tributary. In his verified complaint, Koch asserted that he is a downstream user of the tributary and that in 1989, he dammed the waters of the tributary and developed a pond of approximately 3 acres on his property. The pond is stocked with fish and is appurtenant to Koch's residence. Koch alleged that he also used the stream water to water cattle. He alleged that his pond had been reduced in size over the several years preceding the action due to drought conditions in Cass County. Koch alleged that the Aupperle dam would prevent his pond from filling and deprive him of the use of the stream water for livestock watering. On July 5, the district court entered a temporary injunction preventing the Aupperles from completing construction of their dam. On the same date, Koch posted a $1,000 cash bond.

On July 26, 2005, LPSNRD filed a complaint in intervention and an answer. Koch subsequently filed a motion to strike the complaint in intervention on the basis that LPSNRD lacked a direct and legal interest in the outcome of the controversy. After a hearing on the motion to strike, the district court determined that because LPSNRD had entered into a cost-share arrangement with the Aupperles to provide funds for the dam construction and had been involved in the design and construction stages of

the proposed dam, it had a direct financial interest in the final construction of the dam and pond and was therefore entitled to intervene.

LPSNRD and the Aupperles then filed a motion to dismiss or, in the alternative, to transfer the matter to the Department of Natural Resources (DNR), alleging that that agency had "primary, exclusive, and original jurisdiction to adjudicate the respective surface water rights of the parties." In denying the motion, the district court concluded that it had jurisdiction to determine the action and that the doctrine of primary jurisdiction was not applicable.

At trial, Koch testified that he purchased his property in 1981 and that aside from two brief time periods in the previous 2 years, he had observed a constant flow of water in the tributary. His dam, built in 1989, impounded approximately 40 to 50 acre-feet of water. The pond took approximately a year and a half to fill and seal. In 1990, he stocked the pond with largemouth bass, bluegill, and catfish, and the pond, by the time of trial, had become "one of the best little fishing ponds around."

Koch testified that he used his pond to water his livestock from the time it was constructed until 1997. He had no livestock from 1997 until shortly before trial. He stated that he intended to have a small number of cattle on his property again and that he had recently obtained 7 head; he anticipated having a maximum of 45 head. Although he admitted that he had other water sources for cattle on his property, he testified that he preferred to use the running water from the tributary because "it's the most trouble-free watering you can get for livestock" and was the most convenient source of water for him.

Koch testified that the pond was also used for recreational boating. He also testified that he built his house in 1997 to overlook the pond and had made some improvements on the pond, including the installation of a boat dock. According to Koch, due to drought conditions in the 4 to 5 years preceding the trial, the water level in the pond was down 6 to 8 feet.

Koch testified that he did not obtain permits prior to constructing his dam, but that when he learned that permits were necessary, he made the required permit applications. He was concerned that if the drought continued and the Aupperles were

allowed to construct their pond, no water would pass through to his pond and it would dry up and kill his fish. He requested that the court require a "six-inch draw down" in the Aupperle dam so that water could be passed through the Aupperle structure until Koch's pond was full.

On cross-examination, Koch conceded that he had no appropriative right to use the water in the tributary. He further testified that he wanted all the water in the tributary until his pond was full and that then, the court could authorize upstream impoundment by the Aupperles. He admitted that he had other sources of water that he could use for his livestock, including several other ponds, a well, rural water spigots, and stock tanks. He further admitted that he had not quantified the amount of water he would need for watering his livestock, nor had he analyzed at what point the fish in his pond would be endangered. Koch testified that his dam did not contain a drawdown device similar to the one he sought for the Aupperle dam.

Robert Kalinski testified as an expert on behalf of Koch. Kalinski is a licensed professional civil engineer with bachelor's and master's degrees in geology and a doctorate degree in engineering. Summarized, Kalinski testified that the rate of the ground water-based or spring-based flow in the tributary was greater above the proposed Aupperle dam than it was below the dam. He further testified that the Koch dam had a drainage basin of approximately 260 acres and that the Aupperle basin would take up 178, or approximately 69 percent, of those same acres. Drainage basins are relevant to determining how much precipitation-based runoff will flow into a stream.

Over a continuing foundational objection, Kalinski opined that "significant" spring flows would be eliminated by the construction of the Aupperle dam. He stated that with regard to runoff flows, "just reduction of the drainage basin, particularly during times during years of lower flows, below average precipitation, that that would again significantly reduce the amount of water that was available to flow into . . . Koch's dam." Kalinski testified that during the time the Aupperle pond was filling, there would be little flow to the Koch property.

On cross-examination, Kalinski admitted that the flows in the stream could vary from day to day and location to location and

that the variance could be quite significant. He clarified that his ultimate opinion was that "there's a potential reduction in water that's available to flow to . . . Koch's dam."

The Aupperles and LPSNRD called Michael Jess as an expert witness. Jess has a master's degree in civil engineering and formerly served as the director and deputy director of the Department of Water Resources. Summarized, Jess agreed with Kalinski's calculations regarding drainage basins and streamflows, but disagreed as to the effect of the Aupperle dam. According to Jess, during average precipitation years, the Aupperle dam would not have a significant or substantial effect on the streamflow available to Koch. During times of drought, he opined that neither structure was likely to fill and that thus, the proposed Aupperle dam would not have an adverse effect on Koch's pond. Jess further testified that in times of abundant precipitation, both dams were likely to fill and that the Aupperle dam could serve as flood control. He clarified that his opinions were based solely on precipitation-based runoff and that any spring flows would produce an additional volume of water. Ultimately, Jess testified that based upon a comparison of flow to Koch's dam during drought years, both with the Aupperle dam in existence and without it, the difference in the flow would not be so significant as to make the installation of the Aupperle dam an unreasonable use of the stream water.

Paul Zillig, the assistant manager of LPSNRD, testified that based on data compiled by the Natural Resources Conservation Service, an entity that designed the Aupperle farm pond, there was sufficient water in the tributary to support both ponds. He stated that LPSNRD would not have participated in the Aupperle project had it thought that it would have prevented downstream flows. He testified that virtually all small ponds like the Aupperle pond would at some point reduce downstream flows. He also testified that farm ponds like the Aupperles' are customarily designed without auxiliary passthrough devices, because they are not subject to DNR permit requirements. He explained that the state requires a passthrough device because there is a legal requirement to be able to draw down a pond to 15 acre-feet.

Ronald Aupperle testified that he relied upon the expertise of LPSNRD and the Natural Resources Conservation Service for

the planning and design of his pond. He stated that if he were lawfully directed by the DNR to release flows from his dam, he would comply. On cross-examination, Ronald Aupperle testified that he loved wildlife and trees and that he hoped to eventually establish an arboretum as part of the pond area that school children could visit. He stated that aside from one period during the drought, he had always observed water flowing in the tributary.

On February 10, 2006, the district court entered an order in which it found that both parties intended to use impounded water from the tributary "primarily for aesthetic and recreational purposes with grade stabilization, erosion control, and domestic use (watering cattle) being secondary in nature." The court further found that while both parties intended to use the water for the same purpose, Koch "has priority of appropriation due to the fact that his dam was constructed back in 1989 and has existed since that time." On this basis, the court concluded that "Koch's use of the water from the stream is superior to [the] Aupperles." The district court permanently enjoined the Aupperles from constructing their farm pond "until such time as the dam structure contains a draw-down or similar device which will allow for the passage of water through the dam structure." The Aupperles and LPSNRD filed this timely appeal, and we granted their petition to bypass.[1]

## II. ASSIGNMENTS OF ERROR

The Aupperles and LPSNRD assign, restated, that the district court erred in (1) failing to recognize the primary, exclusive, and original jurisdiction of the DNR; (2) failing to apply the doctrine of unclean hands to Koch's claims; (3) granting Koch a surface water appropriation; (4) finding that the Nebraska statutes required them to install an outlet structure in their dam; (5) finding that Koch had a superior right to use the surface water in the unnamed tributary; (6) admitting the expert testimony of Kalinski; (7) finding that Koch met his burden of proof and granting him injunctive relief; (8) failing to award attorney fees, costs, and other damages for an improperly granted injunction; and (9) dismissing LPSNRD's complaint in intervention.

---

[1] See Neb. Rev. Stat. § 24-1106(2) (Reissue 1995).

On cross-appeal, Koch assigns that the district court erred in failing to strike LPSNRD's complaint to intervene and corresponding answer.

## III. STANDARD OF REVIEW

■ An action for injunction sounds in equity. On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court.[2]

## IV. ANALYSIS

### 1. INTRODUCTION

This is one of two cases on our docket involving the dispute between Koch and the Aupperles regarding their respective rights to water in the unnamed tributary of Weeping Water Creek. From filings in the other case also decided today,[3] we are aware that after the entry of the injunction in this case, the DNR granted Koch's application to impound up to 50.5 acre-feet of water per year on his property. We are also aware from that case that the Aupperles claim a statutory right to impound up to 10 acre-feet of water behind their proposed dam pursuant to Neb. Rev. Stat. § 46-241(2) (Cum. Supp. 2006). Koch's appropriation was not in existence when this case was tried, and the Aupperles claimed no statutory right in this proceeding.

■ As a general rule, an appellate court disposes of a case on the theory presented in the district court.[4] This case was tried on the theory that by virtue of his "senior use" of waters in the tributary, Koch had common-law rights "to the continued supply of water for his pond as well as riparian rights in its use for agricultural purposes" and that the upstream impoundment by the Aupperles would impair such rights. We limit our de novo

---

[2] *Lambert v. Holmberg*, 271 Neb. 443, 712 N.W.2d 268 (2006); *State ex rel. City of Alma v. Furnas Cty. Farms*, 266 Neb. 558, 667 N.W.2d 512 (2003).

[3] *In re Applications of Koch, post* p. 96, 736 N.W.2d 716 (2007).

[4] *Wise v. Omaha Public Schools*, 271 Neb. 635, 714 N.W.2d 19 (2006); *Borley Storage & Transfer Co. v. Whitted*, 271 Neb. 84, 710 N.W.2d 71 (2006).

review to that common-law theory without consideration of any subsequent appropriative or claimed statutory rights.

## 2. SUBJECT MATTER JURISDICTION

■ We begin by addressing the Aupperles and LPSNRD's claim that the district court was without subject matter jurisdiction because of the "primary, original, and exclusive jurisdiction" of the DNR.[5] When a lower court lacks the authority to exercise its subject matter jurisdiction to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court.[6]

Since 1895, Nebraska law governing appropriation of surface water has been statutory.[7] The DNR regulates surface water appropriations under this statutory scheme.[8] It has statutory authority to "make proper arrangements for the determination of priorities of right to use the public waters of the state" and to fix "[t]he method of determining the priority and amount of appropriation . . . ."[9] The Legislature has given the DNR jurisdiction "over all matters pertaining to water rights for irrigation, power, or other useful purposes except as such jurisdiction is specifically limited by statute."[10] In cases involving disputes arising under this statutory scheme, we have noted that the DNR has "original and exclusive" jurisdiction to hear and adjudicate all matters pertaining to water rights for irrigation

---

[5] Brief for appellants at 26.

[6] *Cumming v. Red Willow Sch. Dist. No. 179*, 273 Neb. 483, 730 N.W.2d 794 (2007); *In re Interest of Michael U.*, 273 Neb. 198, 728 N.W.2d 116 (2007).

[7] See, 1895 Neb. Laws, ch. 69, §§ 1 to 69, pp. 244-69; Neb. Rev. Stat. § 46-201 et seq. (Reissue 2004 & Supp. 2005); Richard S. Harnsberger & Norman W. Thorson, Nebraska Water Law & Administration 69-70 (1984).

[8] See *id.* See, also, Neb. Rev. Stat. § 61-201 et seq. (Reissue 2003 & Cum. Supp. 2004); *Spear T Ranch v. Knaub*, 269 Neb. 177, 691 N.W.2d 116 (2005).

[9] § 46-226.

[10] § 61-206(1).

and other purposes, including jurisdiction to cancel and terminate such rights.[11]

■ But prior to the 1895 appropriation law, the common law determined the rights of riparian landowners.[12] The enactment of the appropriation law did not abolish previously vested riparian rights.[13] In this case, Koch asserts a riparian right which he claims to be superior to that of the Aupperles, thereby entitling him to equitable relief. As we have recently noted, courts have jurisdiction to adjudicate common-law claims involving impairment of water rights.[14] The district court correctly concluded that it had subject matter jurisdiction.

■ The district court was also correct in concluding that the primary jurisdiction doctrine was inapplicable to this case. That doctrine applies whenever enforcement of a claim, originally cognizable in the courts, requires the resolution of issues that have been placed within the special competence of an administrative body in accordance with the purposes of a regulatory scheme.[15] Exercise of the primary jurisdiction doctrine is inappropriate in cases involving common-law claims for impairment of water rights, because such actions are traditionally cognizable by the courts without reference to agency expertise or discretion.[16] Thus, the district court had jurisdiction over the subject matter of this action, and we likewise have jurisdiction over the appeal.

### 3. INTERVENTION

In his cross-appeal, Koch contends that the district court erred in not striking LPSNRD's complaint to intervene and answer prior to trial. LPSNRD and the Aupperles contend that the

---

[11] *State ex rel. Blome v. Bridgeport Irr. Dist.*, 205 Neb. 97, 103, 286 N.W.2d 426, 431 (1979). Accord *Hickman v. Loup River Public Power Dist.*, 173 Neb. 428, 113 N.W.2d 617 (1962).

[12] See *Wasserburger v. Coffee*, 180 Neb. 149, 141 N.W.2d 738 (1966).

[13] *Id.*; Harnsberger & Thorson, *supra* note 7.

[14] See *Spear T Ranch v. Knaub, supra* note 8.

[15] *Id.; In re Interest of Battiato*, 259 Neb. 829, 613 N.W.2d 12 (2000).

[16] See *Spear T Ranch v. Knaub, supra* note 8.

district court erred in dismissing the complaint in intervention in its order of permanent injunction.

Intervention in Nebraska is governed by statute. Neb. Rev. Stat. § 25-328 (Cum. Supp. 2006) provides:

> Any person who has or claims an interest in the matter in litigation, in the success of either of the parties to an action, or against both, in any action pending or to be brought in any of the courts of the State of Nebraska, may become a party to an action between any other persons or corporations, either by joining the plaintiff in claiming what is sought by the complaint, or by uniting with the defendants in resisting the claim of the plaintiff, or by demanding anything adversely to both the plaintiff and defendant, either before or after issue has been joined in the action, and before the trial commences.

The intervention shall be by complaint, "which shall set forth the facts on which the intervention rests."[17]

■ We have held that these statutes require a party to have a direct and legal interest in the controversy, which is "an interest of such character that the intervenor will lose or gain by the direct operation and legal effect of the judgment which may be rendered in the action."[18] In its complaint in intervention, LPSNRD pled that in February 2003, pursuant to its statutory authority to enter into cost-sharing arrangements with landowners, it entered into an agreement with the Aupperles that provided assistance in the planning and design of the proposed farm pond and "also a cost-share arrangement with [LPSNRD's] paying 60% of the construction cost." It alleged that the estimated cost of the project was $20,000 and that as of the date of the complaint, its staff had expended approximately 200 hours in planning and designing the farm pond. Attached to the complaint was the cost-share agreement entered into between LPSNRD and the Aupperles. LPSNRD alleged that it had a financial interest in the construction of the farm pond and that

---

[17] Neb. Rev. Stat. § 25-330 (Cum. Supp. 2006).

[18] *Douglas Cty. Sch. Dist. 0001 v. Johanns*, 269 Neb. 664, 671, 694 N.W.2d 668, 674 (2005).

it had an interest in promoting the implementation of its cost-share program.

The district court determined that LPSNRD had already invested money in the farm pond in terms of labor it paid in the design and planning stage. It further noted that LPSNRD had at risk a contractual obligation to pay 60 percent of the construction cost and that the injunction prevented it from seeking completion of its project. The court determined that LPSNRD had a direct and legal interest sufficient to allow it to intervene. We agree with the court's reasoning and conclusion.

In its complaint in intervention, LPSNRD prayed for an order vacating the temporary injunction, dismissing Koch's complaint, taxing costs to Koch, and for attorney fees. We regard the dismissal of the complaint in intervention at the conclusion of the case as a denial of such relief, inasmuch as the court decided the case in Koch's favor. Whether this decision on the merits was in error, as LPSNRD and the Aupperles contend, is discussed below.

### 4. MERITS

#### (a) Did Koch Have Superior Right to Water in Tributary?

At common law, persons owning land bounding upon a watercourse were called "riparian proprietors" and possessed certain rights to use the water as an incident of ownership of the land.[19] "The basic concept of riparian rights is that an owner of land abutting a waterbody has the right to have the water continue to flow across or stand on the land, subject to the equal rights of each owner to make proper use of the water."[20] As explained by one commentator:

> The doctrine of riparian rights is based upon the proposition that each riparian has a right to make a beneficial use of the water of the stream for any purpose so long as such use does not unreasonably interfere with the enjoyment of the same privilege by other riparians.[21]

---

[19] James A. Doyle, *Water Rights in Nebraska*, 20 Neb. L. Rev. 1, 2 (1941).

[20] 1 Waters and Water Rights § 7.01 at 7-2 (Robert E. Beck ed., 2001).

[21] Doyle, *supra* note 19, at 13.

The riparian theory developed in England, at a time and in a climate where there was little use of water for irrigation.[22] Riparian rights extend only to the use of the water, not to its ownership; a riparian right is thus said to be usufruct only.[23] "One of the most significant maxims of riparianism is that, unlike the rule of the prior appropriation system, there is no priority among riparian proprietors utilizing the supply. All riparian proprietors have an equal and correlative right to use the waters of an abutting stream."[24] Of "equal importance" with this maxim is that "use of the water does not create the [riparian] right and disuse neither destroys nor qualifies" the right.[25]

In *Meng v. Coffee*,[26] a dispute among riparian landowners, this court noted that the common law considered running water *"publici juris,"*

> and while it will not permit any one man to monopolize all the water of a running stream when there are other riparian owners who need and may use it also, neither does it grant to any riparian owner an absolute right to insist that every drop of the water flow past his land exactly as it would in a state of nature.

We further noted that the common-law rule gives a riparian landowner "only a right to the benefit and advantage of the water flowing past his land so far as consistent with a like right in all other riparian owners."[27] The purpose of the common-law rule was "to secure equality in the use of the water by riparian owners, as near as may be, by requiring each to exercise his rights reasonably and with due regard to the right of other riparian

---

[22] Harnsberger & Thorson, *supra* note 7.

[23] *Crawford Co. v. Hathaway*, 67 Neb. 325, 93 N.W. 781 (1903), *overruled on other grounds, Wasserburger v. Coffee, supra* note 12; Harnsberger & Thorson, *supra* note 7.

[24] Harnsberger & Thorson, *supra* note 7 at 24.

[25] *Id.* at 25.

[26] *Meng v. Coffee*, 67 Neb. 500, 503, 93 N.W. 713, 714 (1903).

[27] *Id.* at 505, 93 N.W. at 714.

owners to apply the water to the same or to other purposes."[28] Under the common law, "[i]f the rights of the upper owner in the water are no more than those of the lower owner, they are at the same time no less."[29]

█ Applying these principles, we conclude as a matter of law that Koch could not have acquired any "senior" riparian right by constructing his dam in 1989. Any riparian right he may have to use water in the tributary would be equal and correlative to the rights of other riparian proprietors. The rights of one riparian landowner vis-a-vis another is determined by examining the reasonableness of each landowner's respective use of the water.[30]

### (b) Did Koch Meet His Burden of Proof for Entitlement to Injunctive Relief?

Our determination that Koch did not have a senior right does not necessarily resolve the appeal. As a part of our de novo review, we must still address the question of whether he proved facts sufficient to entitle him to injunctive relief under the applicable legal principles.

### (i) Existence of Riparian Right

The first question we must decide is whether Koch has a riparian right, inasmuch as "a person may not be heard to complain, either in a court of law or before an administrative tribunal, as to the infringement of a right which in fact he does not possess."[31] In *Osterman v. Central Nebraska Public Power and Irrigation District*, parties claiming riparian rights objected to applications made by an irrigation district for the allowance of water rights in the North Platte and Platte Rivers. In an appeal

---

[28] *Id.* at 513, 93 N.W. at 718.

[29] *Id.* at 514-15, 93 N.W. at 718.

[30] See, *Meng v. Coffee, supra* note 26; Restatement (Second) of Torts § 850A (1979); Harnsberger & Thorson, *supra* note 7.

[31] *Osterman v. Central Nebraska Public Power and Irrigation District*, 131 Neb. 356, 360, 268 N.W. 334, 336 (1936), *overruled on other grounds, Wasserburger v. Coffee, supra* note 12, and *Little Blue N.R.D. V. Lower Platte North N.R.D.*, 206 Neb. 535, 294 N.W.2d 598 (1980).

from an administrative decision granting the applications, the irrigation district argued that the objectors did not in fact possess riparian rights. We noted evidence that the objectors were representatives of titles for lands bordering the Platte River which were initiated by settlement as early as 1857 and for which patents had been issued earlier than 1870. We concluded that the objectors therefore possessed common-law rights of riparian owners of land.

In *Wasserburger v. Coffee*,[32] parties claiming riparian rights sought to enjoin upstream irrigators who held appropriation permits, claiming that the irrigation exhausted streamflow necessary to water cattle. The irrigators denied that the plaintiffs possessed riparian rights. In resolving this issue, we first examined whether the legislative adoption of the prior appropriation doctrine abrogated all riparian rights. We concluded that while the 1895 irrigation act abrogated the common law of riparian rights in favor of the current system of appropriation, it did not abolish existing riparian rights with respect to parcels of land severed from the public domain prior to April 4, 1895, the effective date of the act. Such rights could be established by showing that "by common law standards the land was riparian immediately prior to the effective date" of the act and that it had not subsequently lost its riparian status as a result of severance.[33] Thus, riparian rights which had vested prior to the effective date of the 1895 act were preserved, but no new riparian rights could be acquired after that date.[34] The 1895 act denied "the common law doctrine as to all riparian land not privately owned" as of its effective date.[35]

There is no evidence in this record establishing when Koch's property was severed from the public domain or whether any predecessor in title held vested riparian rights prior to April 4, 1895. Koch argues that such proof is not required under the

---

[32] *Wasserburger v. Coffee, supra* note 12.

[33] *Id.* at 158, 141 N.W.2d at 745.

[34] Harnsberger & Thorson, *supra* note 7; 1 Waters and Water Rights, *supra* note 20, § 8.02(c).

[35] Doyle, *supra* note 19 at 7.

reasoning of *Brummund v. Vogel*.[36] The plaintiff in that case, claiming riparian rights, sought to enjoin an upstream appropriator from damming a creek which provided the main source of water for the plaintiff's cattle. Our opinion specifically stated that the plaintiff neither pled nor proved

> facts entitling him to vested riparian rights under the common law which might precede April 4, 1895, the effective date of the irrigation act of 1895, which is the cut-off date for the acquisition of riparian rights and the invoking of the law of priority of application giving the better right as between those using the water for the same or different purposes, and preferring domestic use over other uses in cases of insufficient water.[37]

Nevertheless, the opinion goes on to recognize that the right of the downstream user to "use water" from the stream "for domestic purposes" was "superior" to the upstream appropriator's rights.[38] However, because the downstream user failed to meet his burden of proof, injunctive relief was denied.

*Brummund* has been criticized as the cause of "a good deal of uncertainty to the law of riparian-appropriator disputes."[39] The commentators note:

> If domestic users are protected against all others by virtue of the preference laws, then the value of an appropriator's right is considerably diminished. The situation becomes more aggravated if anyone watering livestock (even a person having no protected interest under any known Nebraska law) is given a valid claim to water and the right to enjoin appropriators.
>
> . . . .
>
> . . . Further, expanding livestock watering rights beyond riparians, as *Brummund* may have done, works a substantial change in Nebraska water law, according to many

---

[36] *Brummund v. Vogel*, 184 Neb. 415, 168 N.W.2d 24 (1969).

[37] *Id.* at 420, 168 N.W.2d at 27.

[38] *Id.* at 421, 168 N.W.2d at 28.

[39] Harnsberger & Thorson, *supra* note 7 at 111.

authorities. Thus, to the extent that *Brummund* suggests such an extension, it is wrong.[40]

■ We agree. Prior to *Brummund,* we noted that the "dual administration of water resources under the doctrines of riparian rights and of prior appropriation" results in a "hydra of perplexity" and that the "two methods are incompatible."[41] Our case law prior to *Brummund* characterized surface water rights as either appropriative or riparian and required proof of any claimed riparian right.[42] The departure in *Brummund* from that course was unwise. To the extent *Brummund* suggests that riparian rights can be asserted without proof of their existence, or that there may be a nonriparian, common-law right to surface water, it is disapproved.

The record in this case does not establish that either Koch or the Aupperles held riparian rights. They are simply owners of adjoining tracts of land through which the tributary flows, with Koch's land situated downstream of that of the Aupperles. Koch, as the party seeking injunctive relief, had the burden to show that the proposed Aupperle dam would infringe on his rights. Because he has not even demonstrated the existence of a common-law riparian right, he clearly is not entitled to injunctive relief. Accordingly, we need not analyze the reasonableness of the use by each party of the water flowing in the tributary.[43] However, we note that the record fully supports the finding of the district court that both parties intended to use water in the tributary "primarily for aesthetic and recreational purposes with grade stabilization, erosion control, and domestic use (watering cattle) being secondary in nature."

### (ii) Flowthrough Device

The district court enjoined the Aupperles from constructing their dam "until such time as the dam structure contains a

---

[40] *Id.* at 111-12.

[41] *Wasserburger v. Coffee, supra* note 12, 180 Neb. at 151, 141 N.W.2d at 741.

[42] See, e.g., *Wasserburger v. Coffee, supra* note 12; *Osterman v. Central Nebraska Public Power and Irrigation District, supra* note 31.

[43] See, *Meng v. Coffee, supra* note 26; Harnsberger & Thorson, *supra* note 7.

draw-down or similar device which will allow for the passage of water through the dam structure." To the extent that this reasoning implies that the Aupperle dam was legally required to include a flowthrough device, we examine it as a part of our de novo review of the propriety of injunctive relief.

Section 46-241(1) requires persons intending to construct and operate a storage reservoir to obtain a permit from the DNR. Section 46-241(5) requires that such dams be constructed with a passthrough device. However, § 46-241(2) exempts from the permit requirement "[a]ny person intending to construct an on-channel reservoir with a water storage impounding capacity of less than fifteen acre-feet." The record reflects that the Aupperle dam was designed to fall within this exemption. According to the DNR's regulations, installation of a passthrough device is required only when the dam structure being built is subject to the DNR's review and approval, i.e., when a permit is required to construct the dam.[44] Because the Aupperle dam is, by virtue of its impoundment capacity, exempt from the permit requirement, we conclude that there is no statutory or regulatory requirement that its design must include a passthrough device.

### (iii) Conclusion

Based upon our de novo review of the record, we conclude for the reasons discussed that Koch was not entitled to injunctive relief. Accordingly, we need not address the assignments of error pertaining to the doctrine of unclean hands or the admissibility of expert testimony.

### 5. DAMAGES, COSTS, AND ATTORNEY FEES

LPSNRD and the Aupperles assign error by the district court in failing "to award attorney's fees, costs and other damages to the [LPSNRD] and [the] Aupperles for an improperly granted injunction." Obviously, the district court could not have addressed this issue because it concluded that injunctive relief was proper and granted such relief. Because we vacate the permanent injunction herein, we remand the cause to the district court with directions to determine in the first instance

---

[44] See 457 Neb. Admin. Code, ch. 13, § 001 (2005).

whether LPSNRD and the Aupperles are entitled to recover attorney fees and damages from Koch under the injunction bond or otherwise.[45]

## V. CONCLUSION

Based upon our de novo review, we conclude that Koch was not entitled to injunctive relief. We therefore reverse the judgment of the district court and remand the cause with directions to vacate the injunction, dismiss Koch's verified complaint, and determine whether the Aupperles and LPSNRD are entitled to recover damages or attorney fees as a result of the injunction issued below.

REVERSED AND REMANDED WITH DIRECTIONS.

---

[45] See *Robertson v. School Dist. No. 17*, 252 Neb. 103, 560 N.W.2d 469 (1997).