Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/06/2023 09:07 AM CDT

In re Application A-19594, Water Divisions 1-A, 1-B.
Central Platte Natural Resources District et al.,
appellants, and North Platte Natural Resources
District, appellee and cross-appellant, v.
Nebraska Department of Natural Resources
and Platte to Republican Basin
High Flow Diversion Project,
appellees and cross-appellees.

___ N.W.2d ___

Filed October 6, 2023.    No. S-23-028.

1. **Administrative Law: Statutes: Appeal and Error.** In an appeal from the Department of Natural Resources, an appellate court's review of the director's factual determinations is limited to deciding whether such determinations are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable; however, on questions of law, which include the meaning and interpretation of statutes and regulations, a reviewing court is obligated to reach its conclusions independently of the legal conclusions made by the director.

2. **Motions to Dismiss: Appeal and Error.** Appellate review of an order granting a motion to dismiss is de novo.

3. **Standing: Jurisdiction: Parties.** Standing is a jurisdictional component of a party's case, because only a party who has standing may invoke the jurisdiction of a court; determination of a jurisdictional issue which does not involve a factual dispute presents a question of law.

4. **Motions to Dismiss: Pleadings.** To prevail against a motion to dismiss, the pleader must allege sufficient facts, taken as true, to state a claim to relief that is plausible on its face.

5. **Actions: Parties: Standing.** A party has standing to invoke a court's jurisdiction if it has a legal or equitable right, title, or interest in the subject matter of the controversy.

6. **Standing: Jurisdiction: Claims: Parties.** Standing requires that a litigant have such a personal stake in the outcome of a controversy as to warrant invocation of a court's jurisdiction and justify exercise of the court's remedial powers on the litigant's behalf. Thus, generally, a litigant must assert the litigant's own rights and interests, and cannot rest a claim on the legal rights or interests of third parties.

7. **Standing: Claims.** Common-law standing generally focuses on whether the litigant has suffered or will suffer an injury in fact. That injury must be concrete in both a qualitative and a temporal sense.

8. **Standing: Complaints.** In order to have standing, a complainant must allege an injury to itself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical.

9. **Standing: Proof: Justiciable Issues.** To have standing, a litigant must show that an injury can be fairly traced to the challenged action and is likely to be redressed by a favorable decision.

10. **Administrative Law: Statutes.** For purposes of construction, a rule or regulation of an administrative agency is generally treated like a statute, because properly adopted and filed regulations have the effect of statutory law.

11. **Administrative Law.** Absent a statutory or regulatory indication to the contrary, language contained in a rule or regulation is to be given its plain and ordinary meaning.

12. ____. A court will construe regulations relating to the same subject matter together to maintain a consistent and sensible scheme.

13. **Administrative Law: Waters: Parties: Standing: Words and Phrases.** Taken together, regulations of the Department of Natural Resources in 454 Neb. Admin. Code, ch. 7 (2020), specify that to be a "party" classified as an "objector," one must meet the definition of "interested person" and also be one recognized by the department as having standing.

14. **Administrative Law: Waters: Standing.** The plain language of the regulations of the Department of Natural Resources in 454 Neb. Admin. Code, ch. 7 (2020), implicates common-law standing principles, and those regulations do not confer standing to one lacking common-law standing.

15. **Waters: Standing.** An entity wanting to challenge an application for a surface water appropriation that also requests an interbasin transfer must meet common-law standing.

16. **Evidence: Words and Phrases.** Competent evidence is evidence that is admissible and tends to establish a fact in issue.

17. ____: ____. Relevant evidence is that which has any tendency to make the existence of any fact that is of consequence to the determination

of the action more probable or less probable than it would be without the evidence.

Appeal from the Department of Natural Resources. Affirmed.

Vanessa A. Silke, Steven D. Davidson, Kenneth W. Hartman, and Hannes D. Zetzsche, of Baird Holm, L.L.P., for appellants.

Adam A. Hoesing, Steven C. Smith, and Megan A. Dockery, of Simmons Olsen Law Firm, P.C., L.L.O., for cross-appellant North Platte Natural Resources District.

Michael T. Hilgers, Attorney General, Joshua E. Dethlefsen, and Justin D. Lavene for cross-appellee Nebraska Department of Natural Resources.

Brenna M. Grasz, Paul J. Peter, and Remington S. Slama, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., for cross-appellee Platte to Republican Basin High Flow Diversion Project.

Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

Several entities filed objections to an application seeking an interbasin transfer to divert surface water from an overappropriated Platte River reach to the Republican River Basin. The director of the Department of Natural Resources (Department) determined that each purported objector lacked standing and dismissed the objections. On appeal and cross-appeal, we conclude that Department regulations[1] and interbasin transfer statutes[2] do not confer standing where an objector does not meet common-law standing principles. Because the purported objectors fail that test, we agree with the director that they lacked standing and affirm the order of dismissal.

---

[1] See 454 Neb. Admin. Code, ch. 7 (2020).

[2] See Neb. Rev. Stat. §§ 46-288 and 46-289 (Reissue 2021).

## II. BACKGROUND

We begin by recalling basic elements of Nebraska's water regulatory regimes. Then we turn to the application at issue here, the objections interposed to it, and the procedures followed by the Department leading to the dismissal of those objections.

### 1. SURFACE AND GROUND WATERS

Surface water and ground water are hydrologically related.[3] Surface water includes all water found on the surface of the earth, while ground water is water found under the earth's surface.[4] The two types of water are connected: "Ground water pumping can cause diminished streamflows. Streamflow can support the potential for subirrigation. Seepage from surface water supplies canals, and deep percolation of applied irrigation water from surface projects can recharge ground water aquifers."[5]

### 2. REGULATION OF WATER IN NEBRASKA

Although surface water and ground water are linked,[6] Nebraska uses separate systems regulated by different agencies to allocate each type of water.[7] The Department regulates surface water appropriators, while ground water users are statutorily regulated by a natural resources district (NRD).[8] The Nebraska Ground Water Management and Protection Act (Act)[9] sets forth various requirements to manage the hydrologically connected waters.[10]

---

[3] See *Spear T Ranch v. Knaub*, 269 Neb. 177, 691 N.W.2d 116 (2005).

[4] See *id.*

[5] *Id.* at 183, 691 N.W.2d at 125.

[6] See *Spear T Ranch v. Knaub, supra* note 3.

[7] See *Hill v. State*, 296 Neb. 10, 894 N.W.2d 208 (2017).

[8] *Id.*

[9] Neb. Rev. Stat. §§ 46-701 to 46-756 (Reissue 2021).

[10] See *Hill v. State, supra* note 7.

With certain exceptions, the Act requires the Department to annually evaluate the expected long-term availability of hydrologically connected water supplies for both existing and new surface and ground water uses in each of the state's river basins.[11] For purposes of the evaluation, a river basin may be divided into two or more subbasins or reaches.[12] Where a river basin, subbasin, or reach encompassed within an NRD has not been designated as overappropriated or has not been finally determined to be fully appropriated, the NRD "may, jointly with the department, develop an integrated management plan for such river basin, subbasin, or reach located within the district."[13] In other words, an NRD under those circumstances is permitted but not required to develop an integrated management plan (IMP).

The Act imposes certain duties when a river basin, subbasin, or reach is overappropriated or fully appropriated.[14] Under the Act, a river basin, subbasin, or reach is overappropriated if it is subject to an interstate cooperative agreement among three or more states and if the Department has declared a moratorium on the issuance of new surface water appropriations in such river basin, subbasin, or reach.[15] NRDs encompassing an overappropriated river basin, subbasin, or reach, or one which has been finally determined to be fully appropriated, must jointly develop an IMP for the river basin, subbasin, or reach.[16] In developing an IMP, NRDs must consider the effects of existing and potential new water uses on existing surface water appropriators and ground water users.[17] Further, when a river basin, subbasin, or reach is designated

[11] See § 46-716(1)(a).

[12] § 46-713(1)(a).

[13] § 46-715(1)(b).

[14] See, generally, §§ 46-713 to 46-715.

[15] § 46-713(4)(a).

[16] See § 46-715.

[17] § 46-715(2).

as overappropriated and when the designated area lies within two or more NRDs, the Department and the affected NRDs must jointly develop a basin-wide plan (BWP) for the area designated as overappropriated.[18] The IMPs must be consistent with the goals of the BWPs.[19]

At times, excess flows are available, even in an overappropriated basin, subbasin, or reach. An applicant wanting to apply for a new surface water appropriation within a moratorium or stay area can file a petition seeking a variance to the moratorium or stay.[20] The petition must assert that "[t]he applicant has credible information that indicates there **may be** unappropriated water available at the proposed location at the time the depletion is likely to occur."[21] If the Department grants a variance, the applicant can then file an application for an appropriation under Neb. Rev. Stat. § 46-233 (Reissue 2021).

An application can also be submitted to request an interbasin transfer. Such a transfer is "the diversion of water in one river basin and the transportation of such water to another river basin for storage or utilization for a beneficial use."[22] When evaluating an application under § 46-233 that involves an interbasin transfer of water, the Department must consider a number of factors delineated by the Legislature in order to determine whether denial of such application is demanded by the public interest.[23] "The application shall be deemed in the public interest if the overall benefits to the state and the applicant's basin are greater than or equal to the adverse impacts to the state and the basin of origin."[24]

---

[18] § 46-715(5)(a).

[19] § 46-715(5)(b).

[20] 457 Neb. Admin. Code, ch. 23, § 001 (2020).

[21] *Id.*, § 001.03 (emphasis in original).

[22] § 46-288(3).

[23] See § 46-289.

[24] *Id.*

### 3. Platte River Basin

In 2004, the Department declared an official moratorium on the issuance of new surface water appropriations for three river basins: the Platte River Basin above the mouth of the Loup River, the North Platte River Basin, and the South Platte River Basin. Two months later, the Department designated the Platte River Basin above the Kearney Canal Diversion, the North Platte River Basin including Pumpkinseed Creek, and the South Platte River Basin including Lodgepole Creek as overappropriated. This overappropriated area covered portions of five NRDs, including the North Platte NRD (NPNRD) and the Central Platte NRD (CPNRD). And as mentioned above, the NRDs were required to formulate IMPs and BWPs due to the overappropriated designation.

### 4. Application at Issue

Platte to Republican Basin High Flow Diversion Project (PRD) filed an excess flow permit application with the Department. The operative application, "Amended . . . Application A-19594," sought to divert up to 150 cubic feet per second of excess flows from the Platte River Basin into the Republican River Basin. The application requested the interbasin transfer for purposes of Republican River Compact[25] compliance.

Because the application specified and relied upon a condition that the proposed interbasin transfer and use appropriation would be perpetually junior in status, it asserted that it would have no adverse impact on other water users. The application included a specific request that "the appropriation granted to the PRD project will never be able to exercise a call over any future junior appropriations granted for water uses of the Platte River within the Platte River Basin." The application further stated:

[25] See, Pub. L. No. 78-60, 57 Stat. 86 (1943); 2A Neb. Rev. Stat. appx. § 1-106 (Reissue 2016).

[A]ny final order granting this application should also be conditioned in a manner similar to Permit A-18922 . . . which includes the following condition: "Only those flow's [sic] in excess of the Desired Minimum Discharge shall be considered to be available to be diverted." . . . Therefore, the current beneficial uses of the unappropriated water in the basin of origin will be protected from any impacts of the PRD project.

The application requested that the interbasin transfer permit "be granted with the conditions described above, and any other deemed necessary to protect the public interest."

## 5. OBJECTIONS AND ORDER OF DISMISSAL

Several entities filed objections to the operative application. PRD moved to dismiss the objections, asserting that the objecting entities lacked standing. Following a hearing, the director dismissed all of those entities for lack of standing.

From that dismissal, CPNRD, Lower Loup Natural Resources District (LLNRD), Loup River Public Power District (Loup Power), and Cozad Ditch Company (Cozad Ditch) (collectively appellants) took an appeal. NPNRD filed a cross-appeal to likewise challenge the dismissal. We subsequently granted NPNRD's petition to bypass review by the Nebraska Court of Appeals.[26]

Facts and arguments specific to each appellant and NPNRD will be set out in more detail in the analysis.

## III. ASSIGNMENTS OF ERROR

The overarching issue on appeal is whether the director erred in dismissing appellants and NPNRD for lack of standing. In connection with that issue, appellants additionally assign that the director erred in failing to recognize their rights to object, request a hearing, and initiate a contested case. And on cross-appeal, NPNRD assigns that the director erred in (1) failing to apply Department regulations regarding interested

---

[26] See Neb. Rev. Stat. § 24-1106(2) (Cum. Supp. 2022).

parties; (2) broadly applying *In re Application A-18503*[27] and *Central Neb. Pub. Power Dist. v. North Platte NRD*[28] when, they assert, *Hagan v. Upper Republican NRD*[29] and *Ponderosa Ridge LLC v. Banner County*[30] hold that competitive interests in the same water resources confer standing; (3) applying *In re Application A-18503* and *Central Neb. Pub. Power Dist.* to determine that the integrated management obligations of NPNRD do not confer standing on NPNRD; (4) determining that NPNRD's unprotected interests in excess flow diversions would be protected in the future when no competent and relevant evidence on the record supported that determination; and (5) determining that previous conditions of unrelated excess flow permits amounted to competent and relevant evidence that any use of the excess flows under the application would not harm NPNRD's integrated management obligations.

## IV. STANDARD OF REVIEW

[1] The general standard of review on appeals from the Department is well settled. In an appeal from the Department, an appellate court's review of the director's factual determinations is limited to deciding whether such determinations are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable; however, on questions of law, which include the meaning and interpretation of statutes and regulations, a reviewing court is obligated to reach its conclusions independently of the legal conclusions made by the director.[31]

---

[27] *In re Application A-18503*, 286 Neb. 611, 838 N.W.2d 242 (2013).

[28] *Central Neb. Pub. Power Dist. v. North Platte NRD*, 280 Neb. 533, 788 N.W.2d 252 (2010).

[29] *Hagan v. Upper Republican NRD*, 261 Neb. 312, 622 N.W.2d 627 (2001).

[30] *Ponderosa Ridge LLC v. Banner County*, 250 Neb. 944, 554 N.W.2d 151 (1996).

[31] See *In re Appropriation A-7603*, 291 Neb. 678, 868 N.W.2d 314 (2015). See, also, *McManus Enters. v. Nebraska Liquor Control Comm.*, 303 Neb. 56, 926 N.W.2d 660 (2019).

[2-4] But this is an appeal from an order sustaining a motion to dismiss based on lack of standing. Appellate review of an order granting a motion to dismiss is de novo.[32] Standing is a jurisdictional component of a party's case, because only a party who has standing may invoke the jurisdiction of a court; determination of a jurisdictional issue which does not involve a factual dispute presents a question of law.[33] To prevail against a motion to dismiss, the pleader must allege sufficient facts, taken as true, to state a claim to relief that is plausible on its face.[34]

## V. ANALYSIS

### 1. STANDING PRINCIPLES

The chief issue on appeal is whether the director of the Department erred in determining that the entities filing objections lacked standing. We start by recalling general principles concerning standing.

[5,6] A party must have standing before a court can exercise jurisdiction.[35] A party has standing to invoke a court's jurisdiction if it has a legal or equitable right, title, or interest in the subject matter of the controversy.[36] Standing requires that a litigant have such a personal stake in the outcome of a controversy as to warrant invocation of a court's jurisdiction and justify exercise of the court's remedial powers on the litigant's behalf.[37] Thus, generally, a litigant must assert the litigant's own rights and interests, and cannot rest a claim on the legal rights or interests of third parties.[38] We have

---

[32] See *Central Neb. Pub. Power Dist. v. North Platte NRD, supra* note 28.

[33] See *In re Application A-18503, supra* note 27.

[34] See *Central Neb. Pub. Power Dist. v. North Platte NRD, supra* note 28.

[35] *In re Application A-18503, supra* note 27.

[36] *Id.*

[37] *Id.*

[38] *Id.*

consistently applied these principles to contested cases before the Department.[39]

Common-law standards are typically used to determine whether one has standing.[40] But the Legislature can provide for standing that is broader than common-law standards or standing requirements that are more specific or more restrictive.[41]

[7-9] Common-law standing generally focuses on whether the litigant has suffered or will suffer an injury in fact.[42] That injury must be concrete in both a qualitative and a temporal sense.[43] The complainant must allege an injury to itself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical.[44] Further, the litigant must show that the injury can be fairly traced to the challenged action and is likely to be redressed by a favorable decision.[45]

## 2. Broad Arguments

Appellants argue that the Department's regulations confer standing more broadly than the common-law standard. They contend that the interbasin transfer statutes and case law do not support requiring common-law standing. NPNRD likewise relies on the Department's regulations as conferring standing. But PRD and the Department respond that the regulations, statutes, and case law all require an objector to meet common-law standing requirements. We start with the regulations.

---

[39] See *id.* See, also, *Hagan v. Upper Republican NRD, supra* note 29; *Ponderosa Ridge LLC v. Banner County, supra* note 30; *Metropolitan Utilities Dist. v. Twin Platte NRD*, 250 Neb. 442, 550 N.W.2d 907 (1996).

[40] See *Griffith v. Nebraska Dept. of Corr. Servs.*, 304 Neb. 287, 934 N.W.2d 169 (2019).

[41] See *id.*

[42] See *id.*

[43] See *In re Application A-18503, supra* note 27.

[44] *Id.*

[45] *Id.*

(a) Standing Under Department Regulations

[10-12] Before delving into the regulations, we set forth rules of construction that guide our inquiry. For purposes of construction, a rule or regulation of an administrative agency is generally treated like a statute, because properly adopted and filed regulations have the effect of statutory law.[46] Absent a statutory or regulatory indication to the contrary, language contained in a rule or regulation is to be given its plain and ordinary meaning.[47] A court will construe regulations relating to the same subject matter together to maintain a consistent and sensible scheme.[48] To be valid, a rule or regulation must be consistent with the statute under which the rule or regulation is promulgated.[49]

Appellants and NPNRD direct our attention to regulations for a contested case. One way a contested case begins is with the filing of a formal objection to an application.[50] PRD's application—seeking an interbasin transfer under § 46-289—qualifies as an "[a]pplication."[51] An "[o]bjection is a statement or statements presenting arguments in opposition to an action,"[52] including an "[o]bjection filed in response to a notice of application or petition."[53] The objection filings by appellants and NPNRD fit within this definition. But that does not necessarily make them "objectors."

An "[o]bjector" is defined as "[a] person filing an objection to the granting of an application or petition."[54] This definition

---

[46] *Colwell v. Managed Care of North America*, 308 Neb. 597, 955 N.W.2d 744 (2021).

[47] *Id.*

[48] *Id.*

[49] *Whittle v. State*, 309 Neb. 695, 962 N.W.2d 339 (2021).

[50] 454 Neb. Admin. Code, ch. 7, § 002.01(A).

[51] *Id.*, § 001.02(M).

[52] *Id.*, § 001.08.

[53] *Id.*, § 001.08(B).

[54] *Id.*, § 001.09(B).

comes from a regulation specifying ways in which a *party* may be classified.[55] A "[p]arty" is defined as "an interested person who is recognized by the Department as having standing in a contested case."[56] And an "[i]nterested [p]erson" is defined to be

> a person who or an entity which has a specific legally protectable interest in the applicability of a statute, rule, or order, as distinguished from a general interest such as may be the concern of the public at large. An interested person is one who is or could be adversely affected in a legally cognizable way by the outcome of a proceeding.[57]

[13] Appellants contend that "rather than needing to separately qualify as an interested person, an objector is automatically 'classified' by Department rules as having standing in a contested case."[58] We interpret the regulations differently. Taken together, the regulations of the Department in chapter 7 specify that to be a "party" classified as an "objector," one must meet the definition of "interested person" and also be one recognized by the Department as having standing.

Contrary to appellants' argument, we understand the regulations to contain "textual standing hooks."[59] That phrase refers to terms that we have found implicate common-law standing. For example, we have used the term "'interest'" in defining the common-law standard of standing.[60] We have also addressed whether an entity was "'aggrieved'"[61] or an "'interested

---

[55] See *id.*, § 001.09.

[56] *Id.*

[57] *Id.*, § 001.07.

[58] Brief for appellants at 28.

[59] *Id.* at 32.

[60] *Metropolitan Utilities Dist. v. Twin Platte NRD, supra* note 39, 250 Neb. at 450, 550 N.W.2d at 912.

[61] *Central Neb. Pub. Power Dist. v. North Platte NRD, supra* note 28, 280 Neb. at 539, 788 N.W.2d at 258.

person'"[62] in connection with engaging in a common-law standing analysis. Further, we have used terms like "legally protectable interest"[63] or "legally cognizable"[64] when referencing the common-law standing requirement of an injury in fact.

[14] Returning to the regulation's definition of "interested person," textual standing hooks readily appear. An "[i]nterested [p]erson" is "a person who or an entity which has a specific *legally protectable interest*" and "one who is or could be adversely affected in a *legally cognizable* way by the outcome of a proceeding."[65] We conclude that the plain language of the regulations implicates common-law standing principles and that those regulations do not confer standing to one lacking common-law standing.

### (b) Statutory Basis

We next consider whether any applicable statutes contain textual hooks for common-law standing. PRD's application sought an excess flow permit and an interbasin transfer. Because an excess flow permit is a surface water appropriation, § 46-233 is implicated. And § 46-289 is involved, based on the request for an interbasin transfer.

Appellants acknowledge that we previously found a textual hook for common-law standing in § 46-233. The statute provides in part that "any person having an interest may, in writing, object to the application"[66] and that "[a]ll interested parties shall be allowed to testify and present evidence relative to the application."[67] In *Metropolitan Utilities Dist. v. Twin*

---

[62] *Middle Niobrara NRD v. Department of Nat. Resources*, 281 Neb. 634, 646, 799 N.W.2d 305, 315 (2011).

[63] *Metropolitan Utilities Dist. v. Twin Platte NRD, supra* note 39, 250 Neb. at 447, 550 N.W.2d at 911.

[64] *In re Applications of Koch*, 274 Neb. 96, 98, 736 N.W.2d 716, 719 (2007).

[65] 454 Neb. Admin. Code, ch. 7, § 001.07 (emphasis supplied).

[66] § 46-233(5).

[67] § 46-233(6).

*Platte NRD*,[68] after recognizing several earlier decisions using "'interest'" in defining the common-law standard of standing, we declared that "[§] 46-233 did not supplant the common-law standard of standing."

[15] The language of § 46-289 does not contain a similar recognized textual hook; however, it explicitly acknowledges that a request for an interbasin transfer is based on "an application made pursuant to section 46-233." And because § 46-233 does contain a recognized textual hook, we conclude that an entity wanting to challenge an application for a surface water appropriation that also requests an interbasin transfer must meet common-law standing.

### (c) Case Law

Appellants and NPNRD argue that the director's order cannot be reconciled with this court's decisions in *Hagan*[69] and *Ponderosa Ridge LLC*.[70] In those cases, we determined that competitive interests in the same water resources were sufficient to confer standing. But those cases are distinguishable.

*Hagan* and *Ponderosa Ridge LLC* involved ground water, not surface water. A depletion in ground water can affect others using the same water source. In *Hagan*, we observed that the defendants took water from the same aquifer as that underneath the irrigators' land and stated that "'therefore the [irrigators] are injured in that there is less water available for them for future requests in that the now declining water table of the aquifer will decline further by virtue of the withdrawal of the water by the [d]efendants.'"[71] The same is not true with respect to excess flows of surface water. Such excess flows

---

[68] *Metropolitan Utilities Dist. v. Twin Platte NRD, supra* note 39, 250 Neb. at 451, 550 N.W.2d at 913.

[69] *Hagan v. Upper Republican NRD, supra* note 29.

[70] *Ponderosa Ridge LLC v. Banner County, supra* note 30.

[71] *Hagan v. Upper Republican NRD, supra* note 29, 261 Neb. at 315, 622 N.W.2d at 629.

do not remain in the same stream or basin for later use. Instead, either the excess flows are used or they flow away.

Appellants and NPNRD claim that our case law does not support applying common-law standing. They contend that the director misapplied *In re Application A-18503*.[72] We disagree.

*In re Application A-18503* closely resembles the instant case. It too involved an application to appropriate surface water. NRDs (and a property owner) filed objections to the application. And the same Department regulations were involved. There, like here, the Department dismissed all objecting entities due to lack of standing.

In *In re Application A-18503*, we started by setting forth common-law standing principles. In rejecting an argument that the granting of the application might lead to a fully appropriated designation, we stated that standing could not be based upon speculation. We also cast aside the NRDs' contention that the appropriation would preclude the use of the water for irrigation. We quoted from *Central Neb. Pub. Power Dist.* to the effect that standing requires a more particularized harm than just asserting that use of a limited resource means less availability of that resource for others. We next considered whether a property owner who held senior existing and pending surface water appropriations had standing. The property owner alleged that granting the application would affect his existing appropriations and would increase the cost of his pending applications. But we reasoned that such allegations failed to explain how his rights would be affected when the existing appropriations were both upstream and senior to the requested appropriation.

We are unpersuaded that *In re Application A-18503* should not apply or that the director misapplied it. There, we determined that an entity filing an objection to an application to appropriate surface water must meet common-law standing requirements. We maintained this view despite a dissent

---

[72] *In re Application A-18503, supra* note 27.

contending that "[t]he Department's definition of 'interested person' distinguishes this case from those in which we have interpreted this term in a statute to mean a person with common-law standing."[73] We see no reason to revisit our decision there.

### 3. Whether Common-Law Standing Is Met

Appellants and NPNRD argue that they each alleged sufficient injuries in fact to meet common-law standing requirements. We will consider their respective allegations separately, but first we address the condition in PRD's application, as it will affect our analysis.

Appellants and NPNRD discount the application's proposed condition: to be perpetually junior to all Platte River Basin appropriations. Appellants claim that the "'requested condition' is mere speculation at this point and cannot circumvent [their] standing to object to the application."[74]

But we conclude that the condition is central to the reasoning supporting the director's disposition. The condition is part of the application. Further, the Department is statutorily authorized to impose "reasonable conditions as deemed appropriate to protect the public interest."[75] The requested condition appears to be such a condition.

The proceedings in this court confirm that the condition is essential to the application and cannot be severed from it. During oral arguments, counsel addressed the proposed condition. PRD asserted that the condition was a "critical part" of the application and conceded that the application would be insufficient without it. The Department represented that it could not strike the condition and that the application was predicated entirely upon the condition's being part of it. The

---

[73] *Id.* at 636, 838 N.W.2d at 259 (Connolly, J., dissenting).

[74] Brief for appellants at 40.

[75] Neb. Rev. Stat. § 46-226.02(3) (Reissue 2021).

Department explained that if it were to determine that the condition was not warranted, PRD would need to amend and refile the application, which would then be "re-noticed," and objections could then be made. Given these concessions, we limit our analysis of standing only to the application including the requested condition.

With that limitation in place, we now discuss the various allegations of harm by appellants and NPNRD.

### (a) CPNRD

CPNRD alleged that it owned water rights in or connected to the Platte River, downstream from PRD's proposed diversion point, and that the proposed diversion would injure those water rights. It also asserted that its recharge projects rely on the availability of excess flows. In connection with its management agreement with Cozad Ditch, CPNRD received permit A-18922, which it must use solely for recharge to support compliance with IMPs, BWPs, and the Platte River Recovery Implementation Program (Program). CPNRD also holds a 50-percent interest in permit A-18924, which it must also use for recharge to support IMP and Program compliance. CPNRD alleged that because the Department conditions access to water for permits A-18922 and A-18924 on a case-by-case basis, PRD could access water "instead of, ahead of, or in addition to [permits] A-18922 and A-18924, thus limiting [CPNRD's] access to excess flows and harming its water rights."

CPNRD's allegations essentially assert that granting the application would mean potentially less water would be available to it. This is insufficient to confer standing. As we stated in *Central Neb. Pub. Power Dist.*: "It is axiomatic that any use of a limited resource necessarily results in marginally less availability of that resource for potential use by others. An injury in fact, for standing purposes, requires a more particularized harm to a more direct, identified interest."[76]

---

[76] *Central Neb. Pub. Power Dist. v. North Platte NRD, supra* note 28, 280 Neb. at 543-44, 788 N.W.2d at 261.

Another deficiency observed in *Central Neb. Pub. Power Dist.* is also present here. There, we noted that a power and irrigation district did not allege that the reduction in the amount of water would "f[a]ll short of what was required or even desirable."[77] Likewise, CPNRD did not allege the amount of diverted water would alter streamflows in such a way that there would be a decline in the number of instream flow permits being supported by downstream flows.

Further, CPNRD cannot show that its instream flow rights would be harmed. It recognizes that its instream flow rights are state-protected flows under the Program and that as such, the Department cannot allow new uses of the Platte River unless adverse effects on state-protected flows are either prevented or offset. But CPNRD overlooks that an appropriator with an excess flow permit can divert water only if there is excess water after all other demands have been met. Accordingly, CPNRD's state-protected flows would not be harmed by any excess flow permit that the Department may grant to PRD.

CPNRD also argued that the application would cause it to spend additional public funds because it would need to implement and enforce an IMP and a BWP. An IMP is a planning document that contains possible management options to achieve the goals and objectives of the IMP, but it does not mandate any particular management option.[78] Importantly, CPNRD is already required by § 46-715 to implement and enforce an IMP and a BWP. CPNRD has not linked any harm related to its implementation and enforcement of its IMP and BWP to this application. CPNRD cannot establish that it will suffer an injury in fact.

### (b) Cozad Ditch

Cozad Ditch alleged that it owned real property, including canals and associated infrastructure, and natural flow

---

[77] *Id.* at 543, 788 N.W.2d at 261.

[78] See § 46-715.

appropriations for irrigation use and underground storage. It has an agreement with CPNRD that facilitates CPNRD's use of Cozad Ditch's real property to recharge water for purposes of compliance with an IMP, a BWP, and the Program. Cozad Ditch stated that it "joins CPNRD's objection to the Application as to A-18922 only to the extent the Application harms any interest Cozad [Ditch] may have in A-18922 by virtue of owning the underlying real estate."

Cozad Ditch does not have a sufficient personal stake in the matter. As we noted above, standing generally requires that a litigant assert the litigant's own rights and interests and not rest a claim on the legal rights or interests of third parties.[79] Cozad Ditch's opposition to the application is based on permit A-18922, but Cozad Ditch admits that CPNRD is the record owner of that appropriation. Thus, Cozad Ditch's allegations are based on the rights and interests of another. Because Cozad Ditch cannot base its claim on CPNRD's legal rights or interests, we conclude that Cozad Ditch lacks standing.

### (c) Loup Power

Loup Power owns, maintains, and operates the Loup River Hydroelectric Project. The project's intake diversion weir is located on the Loup River, and its outlet weir is located at the confluence of the project's power canal and the Platte River. To operate the project, Loup Power must maintain its surface water rights from the Department and an operating license from the Federal Energy Regulatory Commission (FERC). Loup Power alleged that the application would harm it because it would "reduce Platte River flows, and reduce Loup Power's ability to generate power and comply with the FERC requirements for its license."

Loup Power's allegations of harm fall short of the common-law requirement. It alleged that a reduction in Platte River flows would harm it "by altering streamflows upon which it must rely for the operation of the [p]roject, and expose Loup

---

[79] See *Central Neb. Pub. Power Dist. v. North Platte NRD, supra* note 28.

Power to the risk of re-initiated formal consultation with [the U.S. Fish and Wildlife Service] to maintain its FERC [l]icense." Like a deficiency in CPNRD's allegation of harm, Loup Power did not allege how the proposed diversion would alter the streamflows to such a degree that Loup Power's ability to generate power and operate the hydroelectric project would be harmed. And Loup Power's allegation that granting the application could jeopardize its operating license from FERC is conclusory and does not allege an injury that is distinct and palpable. Loup Power's contention that it would have to spend public funds to reinitiate formal consultations for its FERC license is speculative. Loup Power's allegations do not show it will suffer an injury in fact.

### (d) LLNRD

LLNRD tries to tie harm to IMP obligations that it voluntarily assumed. Its objection alleged that the Department, contrary to a preliminary determination, made a final determination that the Lower Platte River Basin—which includes LLNRD—was *not* fully appropriated. A statute specifies that an NRD encompassing a river basin that "has not been finally determined to be fully appropriated *may*, jointly with the department, develop an [IMP] for such river basin . . . located within the district."[80] LLNRD did so, even though it was not required. Its argument that the application would require it to spend public funds to implement and enforce its IMP overlooks the fact that LLNRD was not statutorily required to develop an IMP.

LLNRD also alleged that the application's interbasin diversion would harm LLNRD "by reducing the occurrence, volume, and rate of excess flows available to LLNRD to implement its goals, objectives, and action items under the Basin Plan, the IMP, its Rules, and to comply with the Act." But again, claimed harm due merely to less water being available

---

[80] § 46-715(1)(b) (emphasis supplied).

in the stream is not a basis for standing. LLNRD failed to demonstrate that it will suffer an injury in fact.

### (e) NPNRD

NPNRD alleged that it uses unappropriated excess flows for ground water recharge and thus has a direct interest in a competing water use. NPNRD based its opposition to the application in part on "DNR Contract # 985"—a contract it entered into with the Department for an "Excess Flows/Groundwater Recharge Project." Although PRD and the Department suggest that the contract has been terminated, we will assume for the sake of argument that it is still in effect. NPNRD alleged that DNR Contract # 985 allowed it "to divert excess flows in the North Platte River Basin to North Platte Valley irrigation canals for intentional ground water recharge." NPNRD alleged that it used the contract to meet obligations in its IMP and BWP.

Review of the contract leads us to conclude that it does not confer standing on NPNRD. According to the contract, NPNRD operates the recharge project with excess flow permits issued by the Department to participating irrigation districts and canal companies. NPNRD operates the project, but the Department exercises some degree of control. NPNRD's operation must be "in accordance with all permits issued by [the Department]." An attachment to the contract containing the excess flows agreement shows that the irrigator will divert natural flow surface water "when directed by the [Department]" and do so for a designated period of time "and as directed by [the Department]." It further shows that the Department determines the end of the excess flow event.

Mindful that standing cannot be based upon speculation,[81] there are simply too many contingencies that must be met before NPNRD could show it will suffer an injury in fact. To start, there must be excess flows. Next, the Department must determine that an irrigation district can use those excess

---

[81] See *In re Application A-18503, supra* note 27.

flows. Then, NPNRD must have a contractual relationship with that irrigation district. We conclude that NPNRD's ability to use excess flows under DNR Contract # 985 does not provide it with standing.

Further, NPNRD alleged that if the application is approved, its efforts and expenditures with respect to implementing and achieving goals of its IMPs would be diminished. But like CPNRD, NPNRD is already required by § 46-715 to implement and enforce IMPs and does not identify any harm related to this application. We conclude NPNRD has failed to clearly demonstrate that it will suffer an injury in fact.

## 4. Public Interest Standing

Appellants claim that they have public interest standing. They contend that some party should remain available to shed light on the public interest and defend appellants' interests from harm. This argument lacks merit. As set forth above, § 46-233 and 454 Neb. Admin. Code, ch. 7, § 001.07, require the satisfaction of common-law standing requirements. Having failed to meet that standard, appellants cannot bypass it by claiming public interest standing.

## 5. Remaining Assignments

NPNRD also argues that the record contains no competent or relevant evidence of excess flow analysis or of the application's effect on IMP and BWP obligations. NPNRD faults the director for using information in permits A-18922 and A-18924. NPNRD relies on the general standard of review set forth above—review of the director's factual determinations to decide whether they are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable.[82]

We do not read the director's order to make ultimate factual determinations at this point. The director cited permits A-18922 and A-18924 in its discussion of excess

---

[82] See *In re Appropriation A-7603, supra* note 31.

flow appropriations and its explanation regarding why the Department's approach toward integrated management forecloses the possibility of harm caused by such management obligations. The actual approval or denial of NPNRD's contemplated requests depends upon the hydrologic conditions at that future time. By their very nature, those determinations are at this time entirely speculative.

[16,17] To the extent that the director was relying on previous examples of its methodology, we must determine their competence and relevance. Competent evidence is evidence that is admissible and tends to establish a fact in issue.[83] Relevant evidence is that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[84]

We conclude permits A-18922 and A-18924, which are exhibits contained in the record, are competent and relevant evidence for the limited purpose employed in the director's order. They represent applications filed by CPNRD and approved by the Department for excess flows in the Platte River. Thus, they concern the same source of water as the instant application—the Platte River. They contain hydrologic and administrative conditions imposed by the Department to ensure compliance with IMPs and the BWP. They include information that reflects on excess flows in the Platte River and on integrated management obligations. The permits state that they can be exercised only if desired minimum discharges are met. Information in the permits tends to make the existence of a fact that is of consequence for standing purposes more or less probable. We conclude that they provide competent and relevant evidence to support the director's decision.

We do not understand NPNRD to be challenging the Department's taking official notice of facts or documents in

---

[83] *Cain v. Custer Cty. Bd. of Equal.*, 298 Neb. 834, 906 N.W.2d 285 (2018).

[84] *Erickson v. U-Haul Internat.*, 278 Neb. 18, 767 N.W.2d 765 (2009).

the Department's possession. Rather, we understand NPNRD to argue that granting the application could cause "the loss of excess flow to NPNRD."[85] This, in turn, would somehow impair NPNRD's "integrated managed obligations."[86]

The Department argues that NPNRD's assertion rests upon an "untenable chain of contingencies," which the Department characterizes as "far too speculative to provide a basis for standing."[87] We agree. As the Department correctly points out, to the extent NPNRD could use the excess flow permit of a third party, "that would not confer a legally protectable interest and there would be no harm because of PRD's requested condition."[88] In response, NPNRD returns to its reliance on *Hagan* and to its argument that its "future use of the excess flows is placed in jeopardy if another appropriation of the same excess flow exists."[89] This articulation merely repackages the notion that we have already rejected as a basis for legal standing—use of a limited resource means less availability of the resource for others. This assignment lacks merit.

## VI. CONCLUSION

To have standing in this surface water appropriation case, appellants and NPNRD needed to meet the common-law standard. Because their allegations do not demonstrate that they have or will suffer an injury in fact, they each failed to establish standing. We affirm the decision of the director dismissing their objections.

AFFIRMED.

HEAVICAN, C.J., and MILLER-LERMAN, J., not participating.

---

[85] Brief for cross-appellant at 30.

[86] *Id*.

[87] Brief for appellee Department at 40.

[88] *Id.*

[89] Reply brief for cross-appellant at 16.